**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALLEN ROBINSON | ) | |
| | ) | |
| | ) | No. |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| WAYNE FRANO, VINCENT CELIO, CARL | ) | |
| BRASIC, TIMOTHY MCDERMOTT, JOHN | ) | |
| FOLINO, JR., PATRICK CONROY, DAVID | ) | |
| ZELIG, PETER BABICH, and the CITY OF | ) | |
| CHICAGO | ) | |
| | ) | |
| *Defendants.* | ) | **JURY TRIAL DEMANDED** |
| | ) | |

**COMPLAINT**

NOW COMES Plaintiff, ALLEN ROBINSON, by his attorneys LOEVY & LOEVY, and

complaining of Defendants WAYNE FRANO, VINCENT CELIO, CARL BRASIC, TIMOTHY

MCDERMOTT, JOHN FOLINO, JR., PATRICK CONROY, DAVID ZELIG, PETER

BABICH, and the CITY OF CHICAGO, states as follows:

**INTRODUCTION**

1.     Plaintiff Allen Robinson was wrongfully convicted of a 2008 murder and

sentenced to 55 years in prison. He spent nearly 14 years unjustly imprisoned for a crime he did

not commit before he was exonerated.

2.     Plaintiff had nothing to do with the crime and he has always maintained his

innocence.

1

3.      Instead, Plaintiff's arrest, prosecution, and conviction were based on shocking misconduct by Defendant Chicago Police Officers Wayne Frano, Vincent Celio, David Zelig, Timothy McDermott, Carl Brasic, Patrick Conroy, John Folino, Jr., and Peter Babich.

4.      These Defendants built an entirely false case against Plaintiff based on coerced witness testimony.

5.      No physical or forensic evidence of any kind connected Plaintiff to the murder.

6.      Defendants also suppressed exculpatory evidence which Plaintiff could have used to defend himself against the fabricated evidence.

7.      Defendants also coerced individuals into testifying against Plaintiff.

8.      For example, Defendants pressured an individual to falsely identify Plaintiff by threatening to pursue drug charges against him if he did not. That individual became the state's key eyewitness at trial.

9.      As a result of these fabrications and this suppression of evidence, Plaintiff was wrongfully convicted of murder. He spent nearly 14 years in prison for a crime he did not commit.

10.     The Defendants' misconduct resulting in Plaintiff's wrongful conviction was part of a pattern of gross misconduct perpetrated by the Chicago Police Department.

11.     In May 2022, after a hearing on Plaintiff's post-conviction petition, Plaintiff's conviction was vacated and all charges against him were dropped. Nearly 14 years after his terrible ordeal began, Robinson was finally exonerated.

12.     Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

**Jurisdiction and Venue**

13.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the Defendants'
deprivation of Plaintiff's rights secured by the U.S. Constitution.

14.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. §
1331 and supplemental jurisdiction of his state law claim pursuant to 28 U.S.C. § 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b), as the majority of the Defendants
reside in this judicial district and the events and omissions giving rise to Plaintiff's claims
occurred within this judicial district.

**Parties**

16.     Plaintiff Allen Robinson is a 35-year-old Black man born and raised in Chicago.
He is the father of a 16-year-old daughter and two 13-year-old sons.

17.     At all relevant times, Defendants Wayne Frano, Vincent Celio, Carl Brasic,
Timothy McDermott, John Folino, Jr., David Zelig, Peter Babich, Patrick Conroy, and other
unknown law enforcement officers were police officers in the Chicago Police Department acting
under color of law and within the scope of their employment for the City of Chicago.

18.     Defendant City of Chicago is an Illinois municipal corporation and is and/or was
the employer of each of the Defendant Officers. The City of Chicago is liable for the acts of the
Defendant Officers, which were undertaken within the scope of their employment with Chicago.

19.     Each of the individual Defendants is sued in their individual capacity unless
otherwise noted.

**The Crime**

20.     On the night of December 3, 2008, Christopher Handford was tragically shot and
killed in the Austin neighborhood of Chicago.

21.     Handford died from his wounds.

**Plaintiff's Absolute Innocence**

22.     Plaintiff Allen Robinson had absolutely nothing to do with this shooting.

23.     At the time of the shooting, Mr. Robinson was picking up his mother from work.

**Defendants' Initial Investigation**

24.     On the night of December 3, Defendants arrived at the crime scene.

25.     Defendants canvassed the area and walked through the crime scene with Defendant Carl Brasic, the police forensic investigator.

26.     No witnesses or forensic evidence pointed to any suspects. Defendants set up a buy-bust to get one.

27.     In a buy-bust, an undercover officer buys drugs from an intended witness, arrests the witness, and then uses the potential charges as a means of extracting information from the witness.

28.     So began Defendants' months-long campaign of witness manipulation.

29.     The day after the shooting, Defendants set up a buy-bust and arrested an individual named Oscar Russell. Defendants brought him to Area Five Headquarters in handcuffs.

30.     Defendants proceeded to interrogate Russell in a locked interview room.

31.     During the interrogation, Defendants threatened Russell that he would face extensive prison time for a drug offense if he did not identify Handford's shooter.

32.     Defendants held Russell in the station for approximately 24 hours, without providing him with food or allowing him to sleep.

33.     Without any reason of any kind to believe that Plaintiff had any involvement in the Handford murder, but with animosity towards Plaintiff, Defendants created a photo array that included Plaintiff and showed it to Russell.

34.     Russell told the officers that he knew Plaintiff.

35.     Russell also named other individuals who he claimed were at the scene of the shooting.

36.     In fact, Russell had not been present at the shooting or witnessed it at all and did not know who was at the shooting.

37.     That same day, Deandre Guyton arrived at Area Five for questioning. Though Defendants had no reason to believe Guyton was a suspect, they interrogated him in a locked interview room and kept him there for eight hours.

38.     Defendants presented a photo array to Guyton that included Plaintiff.

39.     Like Russell, Guyton told police he knew Plaintiff. He also recalled an argument Plaintiff had with Handford, in which Handford had stopped traffic and Plaintiff had honked his horn.

40.     Defendants then pressured Guyton to view a lineup. Guyton refused, saying that he did not know who had shot Handford.

41.     The next day, Defendants brought in the other people Russell had named and interrogated them.

42.     None of them had been present at the shooting and none of them could provide Defendants with any information about the crime.

43.     Defendants released all those individuals that same day.

**Defendants Coerce Witnesses into Identifying Plaintiff**

44.     The case went cold for three months.

45.     With mounting pressure to solve the case, Defendants invented a story implicating Plaintiff as the shooter.

46.     Defendant Officer Wayne Frano had had several run-ins with Plaintiff, including pulling over Plaintiff while he was driving without any reason whatsoever to believe Plaintiff was committing, had committed, or was about to commit a crime.

47.     Plaintiff became the perfect suspect on whom to pin the crime.

48.     Defendants seized on Plaintiff's traffic argument with Handford as the motive for the shooting. They proceeded to reconduct identification procedures with witnesses they knew had not been present at the shooting to manufacture false identifications of Plaintiff as the shooter.

49.     Defendants arrested Oscar Russell and brought him in again for questioning.

50.     Defendants again handcuffed Russell and placed him in a locked interview room, where he remained handcuffed for twelve hours, without food or sleep.

51.     Defendants proceeded to interrogate Russell.

52.     Once again, Defendants raised the specter of charging Russell for a drug offense and threatened that he would go to jail for a long time unless he identified Plaintiff.

53.     Defendants pressured Russell into identifying Plaintiff from a photo array and giving a false statement implicating Plaintiff.

54.     After Russell falsely identified Plaintiff in the photo array and statement, Defendants released Russell.

55.     That same night, Defendants arrested Guyton as part of another buy-bust.

56.     Defendants interrogated Guyton again for hours, from night until morning.

57.     Defendants similarly threatened Guyton, as they had Russell, if Guyton did not identify Plaintiff.

58.     This time, when presented with the photo array, Guyton falsely identified Plaintiff as the shooter.

59.     Police then pressured Guyton to provide a witness statement implicating Plaintiff. Guyton refused and wrote a truthful statement about not seeing who shot Handford.

60.     To shore up the case against Plaintiff, Defendants showed a photo array to Defendant Frano, who had previously and repeatedly pulled over Plaintiff while Plaintiff was driving with no basis.

61.     Three months after the crime, Defendant Frano suddenly and falsely claimed that Plaintiff was involved in the shooting.

62.     On March 3, 2009, Defendants arrested Plaintiff and took him into custody solely on the basis of the coerced and fabricated witness identifications.

63.     Defendants interrogated Plaintiff, who truthfully denied any involvement in the shooting and maintained his innocence.

64.     Defendants arrested Plaintiff's cousin that day as well. Defendants pressured him to falsely implicate Plaintiff in the shooting.

**Chicago's Policy and Practice of Wrongly Convicting**
**Innocent Persons in Violation of the Constitution**

65.     The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

66.     Since 1986, no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

67.     These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including concealing exculpatory evidence, manipulating witnesses in order to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

68.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

69.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

70.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

71.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

72.     The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Handford Murder and investigation at issue here.

73.     The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation into the Handford Murder.

74.     In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

75.     Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

76.     Prior to and during the period in which Plaintiff was falsely charged with and convicted of the Handford Murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

77.     In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

78.     The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the *Klipfel* litigation.

79.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by Charlie Beck, the interim superintendent of the CPD. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

80.     As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse

circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

81.     This belief extends to the Defendants in this case. By way of example, Chicago police officers have a long history of engaging in the kind of investigative misconduct that occurred in this case, including manipulating eyewitness identification as well as fabricating and concealing evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Chicago police officers engaged in the serious investigative misconduct described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

82.     The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful charging and conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.     The conduct of live lineup, photographic, and other identification procedures.

b.     The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

c.     The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d. The risks of wrongful conviction and the steps police officers should take to minimize risks.

e. The risks of engaging in tunnel vision during investigation.

f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

83. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

84. The city's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

85. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

86. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Plaintiff's Wrongful Conviction and Imprisonment**

87. As a result of the Defendants' misconduct and based on the false evidence described in this Complaint, Plaintiff was charged, prosecuted, and convicted of murder.

88. In the absence of the Defendants' misconduct, Plaintiff would never have been arrested, indicted, prosecuted, or convicted. At no point in time between 2008 and the present day has there been any credible evidence giving rise to probable cause to suspect Plaintiff of Handford's murder.

89. The Defendants' fabrication of evidence was not disclosed to state prosecutors, Plaintiff, or his criminal defense attorneys in advance of his criminal trial. In fact, Defendants suppressed all evidence that exonerated Plaintiff.

90. The Defendants used false police reports to cover up their misconduct. They provided those false reports to state prosecutors, and those reports became the basis for charging and prosecuting Plaintiff.

91. Defendants also gave false statements to state prosecutors and provided false testimony at Plaintiff's criminal trial.

92. No inculpatory evidence other than the evidence fabricated by Defendants was introduced at Plaintiff's criminal trial.

93. At all times, Defendants suppressed the true circumstances of their identification and lineup procedures.

94. At all times, Defendant Patrick Conroy was aware of Defendants' misconduct and their fabrication of a case against Plaintiff. As a supervisor, he nevertheless intentionally ignored the Defendants' misconduct and decided to make Plaintiff liable for a crime he did not commit, rather than directing the investigating officers to find the person who had actually committed the crime.

95.     In addition, on information and belief, the Defendants suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have shown Plaintiff's innocence.

96.     Plaintiff maintained his innocence throughout the proceedings.

97.     However, because of Defendants' false and manufactured evidence, Plaintiff was wrongly convicted and sentenced to 55 years in prison.

98.     He spent the next 13 years of his life imprisoned for a crime that he did not commit.

99.     Plaintiff's whole life was turned upside down without any warning. His young adulthood was entirely consumed by the horror of his wrongful imprisonment.

100.    The conviction took a large toll on Plaintiff's family. At the time of his arrest, Plaintiff had a young daughter and two young sons were born shortly after. As a result of Defendants' misconduct, Plaintiff was imprisoned for most of his children's childhood and adolescence. Plaintiff lost his chance to raise his children, which has had a profound impact not only on his life, but also on his relationship with his children.

101.    Plaintiff missed countless milestones in his children's lives, including birthdays, first days of school, and graduations.

102.    In addition, Plaintiff was taken away from and missed out on the lives of his family and friends. He returned home to relationships changed by or lost to over a decade of wrongful incarceration.

103.    Plaintiff's grandmother passed away while he was in prison, and Plaintiff was not given permission to attend her funeral.

104.    Plaintiff was robbed of his young adulthood. He was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

105.    During his 13 years of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in maximum-security prisons.

106.    Plaintiff never knew whether the truth would come out or whether he would ever be exonerated.

107.    In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects.

108.    Plaintiff has been branded as a murderer. He has suffered profound reputational harm as a result.

**Plaintiff's Exoneration**

109.    Plaintiff fought hard to prove his innocence.

110.    He has consistently and credibly maintained his innocence at every stage of his criminal proceedings.

111.    On May 2, 2022, Plaintiff's collateral petition requesting to have his conviction vacated was granted, and his conviction was set aside.

112.    On May 9, 2022, all charges against Plaintiff were dropped.

113.    On April 26, 2023, the Illinois courts granted Plaintiff a Certificate of Innocence.

## COUNT I
### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

114.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

115.     As described in detail above, Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

116.     In the manner described more fully above, Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

117.     Defendants knew this evidence was false.

118.     Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

119.     In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

120.     In addition, based upon information and belief, Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

121.     Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

122.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

123.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

124.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT II**
**42 U.S.C. § 1983 – Unlawful Detention**
**(Fourth and Fourteenth Amendments)**

125.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

126.    In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

127.    In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

128. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

129. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

130. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT III
### U.S.C. § 1983 – Failure to Intervene

131. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

132. In the manner described above, during the constitutional violations described herein, one or more of Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

133. These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

134. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

135. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

136. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT IV**
**U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

137.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

138.    In the manner described more fully above, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for Christopher Handford's murder, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

139.    In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

140.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

141.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

142.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

143.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT V**
**42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago**

144.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

145.    As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

146.    At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

147.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

148.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated

evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

149.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (3) individuals were forced to sign or assent to oral and written statements fabricated by the police; (4) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (5) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

150.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed

to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

151.    These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

152.    The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

153.    As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

154.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

155.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VI
## State Law Claim – Malicious Prosecution

156.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

157.    In the manner described above, the Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

158.    In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

159.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in May 2022.

160.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

161.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII
## State Law Claim – Intentional Infliction of Emotional Distress

162.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

163.    The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

164.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VIII**
**State Law Claim – Willful and Wanton Conduct**

165.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

166.    At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct in connection with the Christopher Handford murder investigation.

167.    Notwithstanding that duty, the Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

168.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT IX**
**State Law Claim – Civil Conspiracy**

169.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

170.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to

accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

171.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

172.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

173.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

174.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim – *Respondeat Superior*

175.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

176.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

177.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI
### State Law Claim - Indemnification

178.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

179.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

180.     The Defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

181.     Defendant City of Chicago is responsible to pay any judgment entered against the Defendants.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:

**ALLEN ROBINSON**

By: /s/ Annie Prossnitz
*One of Plaintiff's Attorneys*

Jon Loevy
Danielle Hamilton
Annie Prossnitz
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312)243-5900
prossnitz@loevy.com