IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS,           )
                                            )
                              Respondent,   )
                                            )
        v.                                  )      No. 09 CR 6422
                                            )      Judge Mary M. Brosnahan
ALLEN ROBINSON,                             )
                                            )
                              Petitioner.   )

PETITION FOR POST-CONVICTION RELIEF
& REQUEST FOR AN EVIDENTIARY HEARING

Petitioner, **ALLEN ROBINSON**, by and through his attorneys, **BLEGEN &
GARVEY**, pursuant to 725 ILCS 5/122-2.1, as well as the Due Process, Equal
Protection, and Effective Assistance of Counsel provisions of the Fifth, Sixth and
Fourteenth Amendments to the Constitution of the United States and Article One,
Sections Two and Eight of the Constitution of the State of Illinois, respectfully
submits the following Petition for Post-Conviction Relief.

I.      **Procedural Background**

On June 23, 2011, Petitioner was convicted following a bench trial of first
degree murder by personally discharging a firearm. The charges arose from the
shooting death of Christopher Hanford on the night on December 3, 2008. After the
denial of post-trial motions, Petitioner was sentenced by this Court to fifty-five (55)
years in the custody of the Department of Corrections.

On April 23, 2013, Petitioner's conviction was affirmed by the Illinois
Appellate Court, First District. Leave to appeal to the Illinois Supreme Court was
denied on September 25, 2013.

Petitioner is currently serving the custodial portion of his sentence at the Menard Correctional Center, Inmate No. R67377. This petition is timely filed on or before June 24, 2014.

## II.    Statement of Facts

On June 20, 2011, Petitioner's trial commenced. Just prior to jury selection, defense counsel announced his intention to call Lamarius Robinson, a.k.a. "Mard", "Mardi" or "Mari", Petitioner's cousin, to testify for the defense, and to introduce a letter counsel alleged was written by Lamarius. In the letter, Lamarius admitted that he shot Hanford, that Petitioner did not, and that Petitioner was not even present at the time of the shooting. The court questioned whether the "only way to be able to prove up that he [Lamarius], in fact, was the author of the letter was for him to testify. Am I correct?" (Tr.A18) Neither side stated whether the court was correct or not. Ultimately, the court tabled the issue to be discussed again once it was known whether or not Lamarius would testify or plead the Fifth Amendment. The jury was then selected.

The following day, the State began the presentation of its evidence with Norma Wilson, the grandmother of the deceased. Ms. Wilson testified as to Christopher Hanford's appearance in life, and his appearance in death. (Tr. B20-22) She also testified that on December 3, 2008, Hanford left her residence at 6:30 or 7:00 p.m. to go to his friend Dre's house. (Tr. B21)

Oscar Russell testified for the State that he was in the area of Iowa Street and Lamon Avenue, in Chicago, at 7:00 a.m., on December 3, 2008, selling narcotics. (Tr.

2

B28-B29) After 9:00 p.m. that day, Russell testified that he saw Petitioner and Petitioner's cousin, who Russell knew as "Mard", in the same area. At that time, Mard was waving a black handgun. (Tr. B33) While the three of them were standing on the street, a man in a car drove by and said "dude down the street." (Tr. B34) According to Russell, all three men walked down Iowa toward Lawler Avenue. (Tr. B34-B35)

Russell testified that once they got to Lawler, he observed a group of people standing on the corner, including Hanford. (Tr. B36) Russell claimed that Petitioner and Hanford began arguing and then a physical altercation ensued. (Tr. B36) According to Russell, during the fight, Mard pulled out a handgun and told Hanford's friends not to jump into the fight. (Tr. B37) Russell claimed that during the fight Hanford was getting the best of Petitioner, so Petitioner grabbed the gun from Mard and shot Hanford several times. (Tr. B37-B38) Russell testified that he then ran toward Iowa and Lamon. (Tr. B39)

According to Russell's testimony, he went to the Chicago Police Department located at Area Five the next day. While there, he viewed two photo arrays, and identified Petitioner in one and Mard in the other. (Tr. B41-B42) On March 3, 2009, Russell testified that he again went to the police station and told police the same thing. (Tr. B47) Finally, Russell testified that on March 30, 2009, he appeared in the grand jury and testified that Petitioner was the shooter. (Tr. B48)

On cross examination, Russell testified that he had four prior narcotic possession convictions, and that he was currently in the Illinois Department of

3

Corrections after having been convicted of Aggravated DUI. (Tr. B53) With respect to his interviews by police regarding the shooting of Hanford, Russell testified that each time he was brought to the station by police in handcuffs and placed in a locked interview room where he remained handcuffed. (Tr. B56) Russell testified that he was not free to leave, and he thought he was under arrest. (Tr. B57)

According to Russell, on the night of the shooting, there were at least seventeen to eighteen people on the street corner when Hanford was shot. (Tr. B68) Russell testified that he was on the other side of the street from Petitioner, Mard and Hanford. (Tr. B69) Russell testified that Mard and Petitioner were facing away from him with the gun, and that he took off running when he heard gun shots. (Tr. B72)

On re-direct, Russell testified that no threats or promises were made to him in relation to his testimony. (Tr. B75) According to Russell, he saw Petitioner shooting the gun after having taken it from Mard. (Tr. B78-B79)

The state also called Deandre Guyton. According to Guyton, he had known Hanford from the neighborhood for 3-4 years prior to the shooting, and they were friends. (Tr. B110) On the night of December 3, 2008, at approximately 8:30 p.m., Guyton testified that he was walking around the neighborhood alone when someone with a gun ran up to him. (Tr. B110) Guyton testified that the person was Mard, who he knew as Petitioner's cousin, and another person was with Mard, but it was not Petitioner. (Tr. B113) According to Guyton, Mard put the gun to his face and tried to shoot, but the gun did not go off. (Tr. B114) Guyton tried to grab the gun, and then tried to use the person with Mard as a shield. (Tr. B115) When it was clear that

4

Mard could not get the gun to work, Guyton testified that he got up and ran back to his house. (Tr. B116)

Guyton testified that once at home, he called Hanford to tell him what happened. (Tr. B117) According to Guyton, Hanford was on his way to Guyton's house, so Guyton went outside to wait for him. (Tr. B118) Guyton testified that when he saw Hanford walking toward his house, there were 3-5 other people outside too. (Tr. B118) According to Guyton, Hanford never made it to Guyton's house because he was shot at Lawler and Iowa before arriving. (Tr. B118-B119) Guyton testified that he saw five guys walk up to Hanford, but that he did not see who shot Hanford. (Tr. B119-B120) Guyton said Petitioner and Mard were present, however. (Tr. B120)

Guyton testified that the police grabbed him the next day and showed him a photo array, but he refused to sign it. (Tr. B121) According to Guyton's testimony, the police grabbed him again three months later, and he signed a photo array identifying Petitioner. (Tr. B123) Guyton clarified his statement to police by testifying that he told them Petitioner was *with* whoever shot Hanford, not that Petitioner shot Hanford. (Tr. B123)

Guyton further refuted some of the statements contained in the type-written statement attributed to him by an Assistant State's Attorney. According to Guyton, it was his recollection that he told the ASA that the gun shots came from the direction Petitioner was standing, and that he did not say he saw Petitioner holding the gun. (Tr. B129-B130)

Guyton then testified about the contents of his grand jury testimony. (Tr.

5

B135-B142) According to Guyton's grand jury, he saw no one with a gun other than Petitioner, and that he saw Petitioner raise the gun and start shooting. (Tr. B136, B138)

Guyton testified that he had a child with a woman named Shanice Johnson, and that Petitioner also had a child with Ms. Johnson. (Tr. B153) He further testified that he told police that he would not sign the photo array because he did not want his name involved in a murder. (Tr. B152)

On cross examination, Guyton testified that he saw Hanford get shot, but he did not see who did the shooting. (Tr. B158) When he was interviewed by police on March 3, 2009, Guyton testified that he was arrested at a traffic stop, and then taken to Area Five. (Tr. B163-B164)

With respect to the night of the shooting, Guyton testified on cross examination that when Mard approached him with a gun, he was with another man who was not Petitioner. (Tr. B169) Later, when Hanford was shot, Guyton testified that there were only five guys on the street, and that no fight took place prior to the shooting. (Tr. B174)

The State called two of the ASAs who interviewed Guyton. ASA Melissa Meana testified that she interviewed Guyton at the Area Five police station on March 3, 2009. (Tr. B191) According to Meana, Guyton said that Petitioner shot Hanford, and Mard was present. (Tr. B192) Meana testified that she then typed up Guyton's statement, reviewed it with him and had him sign it. (Tr. B193-B195)

Meana testified on cross examination that Guyton told her nothing about a

6

fight having occurred prior to the shooting, as Russell claimed to have witnessed, or that Petitioner supposedly grabbed a gun from Lamarius Robinson ("Mard"), which Russell also claimed to have seen. (Tr. B209)

Prior to the testimony of the second ASA, the court was notified that one of the jurors (Juror Mann) had received a ride to court from an ASA not assigned to the case. (Tr. C3) The court questioned Juror Mann about the circumstances of the ride, and Juror Mann stated that no discussions of the case were had with the ASA. (Tr. C4) Juror Mann was not asked any questions about his relationship with the ASA, nor the substance of any of their conversations in the car. Indeed, defense counsel voiced no objection whatsoever.

ASA Tene McCoy-Cummings testified that she questioned Guyton in the grand jury on March 30, 2009. (Tr. C12) According to McCoy-Cummings, Guyton testified that he saw Petitioner raise the gun and start shooting. (Tr. C12) On cross examination, McCoy-Cummings testified that Guyton did not tell her a fight occurred before the shooting, nor did he tell her that Lamarius had possession of the gun before Petitioner. (Tr. C17-C18)

The State also presented the testimony of Chicago Police Officer Wayne Frano. Frano testified that he was on routine patrol on December 3, 2008, at 9:10 p.m., in the area of Augusta Avenue and Lavergne Avenue, when he heard shots fired. (Tr. B87-B88) According to Frano, when he and his partner approached the light at Iowa, three black males ran toward their car. (Tr. B89) Frano testified that he recognized one of the individuals to be Petitioner, but he did not recognize the other two. (Tr.

B89) One of the men, slowed down and told Frano that a shooting had occurred and he pointed toward Lawler and Iowa. (Tr. B91)

Frano testified that it took him and his partner only three seconds to get the site of the shooting after hearing the shots. (Tr. B97) On cross examination, Frano admitted that when they arrived on the corner, he saw no other individuals besides the three that ran. (Tr. B98) Frano also admitted on cross examination that he never told any detectives about having seen Petitioner on the night of the shooting until March 4, 2009. (Tr. B103) Nor did he write any reports about what he witnessed. (Tr. B103)

Chicago Police Forensic Investigator Carl Brasic testified that photographed the scene of the shooting on December 3, 2008. (Tr. C30) He also collected any physical evidence he could find. (Tr. C32)

Illinois State Police Forensic Officer Marc Pomerance testified that he examined the casings recovered from the scene, and determined that they were all fired from the same gun. (Tr. C70) According to Pomerance, the cartridges were for a .45 caliber weapon. (Tr. C64-C65) Pomerance testified that he could not determine if the casings and bullets came from the same gun, however, because he would need the actual gun to do a control test. (Tr. C76)

Chicago Police Detective Timothy McDermott testified that he was assigned to investigate the shooting of Hanford. (Tr. C85) McDermott testified that he went to the scene and began organizing a canvas for witnesses. (Tr. C88) After being on the scene, he returned to his office and submitted a "buy-bust" request in hopes of

8

producing a witness with information. (Tr. C91) McDermott testified that a "buy-bust" is an investigative tool used to develop leads or witnesses. (Tr. C91)[1]

According to McDermott, he was notified that Guyton was at the station to provide information, but McDermott spoke with Russell first. (Tr. C92-C93) Russell was locked in an interview room when McDermott spoke with him. (Tr. C 95) After speaking with Russell, McDermott testified that he created a photo array, and Russell identified Petitioner from the array. (Tr. C99) According to McDermott, Russell identified Petitioner as the person he sold drugs for. (Tr. C100) McDermott also testified that Russell identified Petitioner as the person who shot and killed Hanford. (Tr. C100) Russell also identified Lamarius as an associate of Petitioner's. (Tr. C101)

McDermott testified that he next spoke with Guyton. (Tr. C102) After speaking with Guyton, McDermott assembled another photo array and showed it to Guyton. (Tr. C103) According to McDermott, Guyton refused to sign the photo array advisory form, claiming that he did not want his name associated with a murder. (Tr. C104) Guyton did identify Petitioner in the array as someone he knew from the streets. (Tr. C106) According to McDermott, despite Russell's identification of Petitioner as the shooter, he did not arrest Petitioner because he had no corroboration of Russell's claims. (Tr. C108) Apparently no evidence was cultivated

---

[1] In case law, a "buy-bust" is described as an undercover police officer or informant buying drugs from a target, and the police arrest the target and use the pending charges to obtain information on an unrelated matter. *See generally, People v. Hayes*, 144 Ill.App.3d 696, 494 N.E.2d 1238 (2nd Dist. 1986).

in the next three months, and Petitioner was never brought in for questioning.

Three months later, on March 2, 2009, McDermott testified that he was informed that Guyton was in custody, and willing to talk. (Tr. C109) This time Guyton was, as McDermott testified, "more forthcoming." (Tr. C110) According to McDermott, Guyton signed the photo array advisory form and identified Petitioner as the shooter. (Tr. C113) McDermott testified that he then brought Russell in for further questioning, and had both men interviewed by the State's Attorney's Office Felony Review Unit. (Tr. C115-C116)

After giving their statements to the ASAs, McDermott went to Petitioner's home and placed Petitioner under arrest. (Tr. C117) According to McDermott, Petitioner fled out the back door on foot, but was caught immediately. (Tr. C117) McDermott testified that Lamarius was also taken to the station to be interviewed. (Tr. C118)

On cross examination, McDermott admitted that both Russell and Guyton identified Petitioner on December 4, 2008, and he knew where Petitioner was living, yet he never went to question Petitioner before his arrest on March 3, 2009. (Tr. C125-C126) Indeed, McDermott admitted that no additional evidence was cultivated in the three intervening months. (Tr. C127) McDermott also acknowledged that the first time he spoke to Frano about Frano's purported observations the night of the shooting was on March 4, 2009, when Frano viewed Petitioner in a line-up. McDermott acknowledged that he had seen Frano on occasion at the station, but they had not discussed this case. (Tr. C137) McDermott also admitted that Guyton was in

custody on March 2, 2009, as a result of a buy-bust. (Tr. C143)

The state also called the forensic pathologist, Dr. James Filkins, who conducted the autopsy of Hanford. (Tr. C171) Filkins testified that Hanford was shot four times, and the cause of death was multiple gun shot wounds. (Tr. C190)

Lastly, the state indicated that it now wished to call Lamarius Robinson as a witness in its case, but since he remained a suspect in the case, the state indicated he had a Fifth Amendment right which he should be advised of before testifying. (Tr. C151) The court concluded that since he could be charged on an accountability basis, Lamarius was entitled to consult with the Public Defender before testifying. (Tr. C152)

After a short recess, the Public Defender advised the court that Lamarius would invoke his Fifth Amendment right not to testify. (Tr. C154) The state informed the court that they had spoken with Lamarius about a letter that he had allegedly written to Petitioner wherein he admitted to having committed the offense. (Tr. C155) Lamarius denied to the state having written the letter or having any knowledge of it, though he indicated that he may have addressed the envelope. (Tr. C155) Furthermore, Lamarius told the state that he only told the police what they made him say, and that he was not present at the shooting. (Tr. C155)

Defense counsel informed the court that Lamarius told him the same thing. (Tr. C155) According defense counsel, Lamarius claimed only to have heard about the shooting on the street, and that he "hemmed and hawed" about the letter but ultimately denied writing it. (Tr. C155)

11

Lamarius was then called to the stand outside of the presence of the jury. (Tr. C156) Lamarius denied being at the scene of the shooting on December 3, 2008. (Tr. C157) He also denied telling the police that he witnessed the shooting. (Tr. C158) Lamarius then invoked the Fifth Amendment and refused to answer any further questions. (Tr. C158)

The state argued that Lamarius's denial that he was at the scene and denial that he wrote the letter to Petitioner negated his Fifth Amendment privilege such that he should not be precluded from testifying. (Tr. C159) The court ruled that because the state said pretrial that he was the subject of a continuing investigation, he was permitted to invoke his Fifth Amendment right not to testify. (Tr. C162) The letter allegedly written by Lamarius to Petitioner was not entered into evidence by defense counsel, and was, therefore, not available for review on direct appeal.

Defense counsel requested that he at least be allowed to testify that he was not at the scene in order to impeach Guyton and Russell's claims to the contrary. (Tr. C163-C164) The court refused to allow Lamarius to answer some questions and not others before the jury. (Tr. C165)

After the conclusion of the testimony, the state rested. (Tr. C195) A motion for directed finding was denied. (Tr. C200) The court advised Petitioner of his right to testify, and Petitioner declined to testify. (Tr. C201) The defense rested without the presentation of any evidence. (Tr. C202)

In its closing argument, the state argued that Petitioner was guilty, and that the jury never heard any testimony that anyone else was the shooter. (Tr. D11) In its

closing, the defense emphasized the differences between Guyton and Russell's version of the shooting. (Tr. D34-D35)

The jury subsequently convicted Petitioner of murder, and the enhanced sentencing provision for having personally discharged the firearm. (Tr. D84)

### III. Petitioner Was Denied Effective Assistance of Counsel at Trial in Violation of the Sixth Amendment to the United States Constitution and Article One, Section Eight of the Illinois Constitution.

It is a well settled principle of law that a criminal defendant has a constitutional right to the effective assistance of counsel at trial. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984); *People v. Dillard*, 204 Ill.App.3d 7, 561 N.E.2d 1219 (3rd Dist. 1990); *People v. Makiel*, 358 Ill.App.3d 102, 830 N.E.2d 731 (1st Dist. 2005). To establish a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient, and that he was prejudiced by the deficient performance. *Dillard*, 561 N.E.2d at 1220-21; *Makiel*, 830 N.E.2d at 737.

Through a multitude of failures, it is clear in this case that Petitioner was not afforded the effective assistance of counsel guaranteed to him by the Sixth Amendment of the Constitution. Indeed, a review of the record, coupled with the evidence that counsel failed to present, makes clear that Petitioner is actually innocent of this crime, and had a more than reasonable likelihood of success at trial had his counsel not been prejudicially deficient.

13

A.   **Trial counsel was ineffective for failing to investigate and present evidence that would have refuted the State's evidence, established that Petitioner's cousin was the actual shooter, and shown that Petitioner was not even present at the scene of the shooting.**

Trial counsel failed to present testimony from the following individuals: Jenee Moreland, Quinton Martell Davis, Latanya Fleming, Ethel Lewis, Johntay Washington, Ozell Jackson, and Aaron Marshall. These witnesses would have provided evidence that Petitioner had an alibi for the time of the shooting, and that Lamarius Robinson admitted to having been the shooter. These witnesses would also have impeached the credibility of Oscar Russell and Deandre Guyton. Trial counsel's failure to interview and then present the testimony of these witnesses was indefensible and extremely prejudicial to Petitioner's defense.

Perhaps the most well recognized example of ineffective assistance of trial counsel is the failure to investigate potentially exculpatory evidence. *See, Dillard,* 561 N.E.2d at 1220-21; *Makiel,* 830 N.E.2d at 739. Indeed, defense counsel have a professional obligation to explore and investigate a client's case. *Id.* And, while decisions to call witnesses generally fall within the ambit of trial strategy, counsel may be ineffective for failing to present exculpatory evidence of which he is aware, and which would support an otherwise uncorroborated defense. *People v. Skinner,* 220 Ill.App.3d 479, 485-86, 581 N.E.2d 252 (1st Dist. 1991). Matters of trial strategy will not be upheld where the strategy is unsound. *See, People v. Thompkins,* 191 Ill.2d 438, 470, 732 N.E.2d 553 (2000) (counsel ineffective for failing to present mitigating evidence at sentencing where no sound reason not to present such

14

evidence existed).

In this case, trial counsel's failure to investigate and present testimony from the aforementioned witnesses was objectively unreasonable in light of the nature of the potential testimony. As Petitioner makes clear in his affidavit, attached hereto as Exhibit A, he requested that his trial counsel interview all of the witnesses set forth below and present their testimony on his behalf. Yet, counsel failed to even interview any of the individuals to ascertain the importance of their testimony, let alone call them at Petitioner's trial.

> 1. **Jenee Moreland an Quinton Davis would have testified that Lamarius Robinson confessed to killing Hanford immediately after the shooting.**

Attached hereto as Exhibit B is the affidavit of Jenee Moreland. In her affidavit, Ms. Moreland describes an interaction she had with Lamarius Robinson on December 3, 2008, shortly after the shooting of Hanford. Ms. Moreland states that she received a call from Lamarius at approximately 9:15 p.m. that night, and he requested that she pick him up. According to Ms. Moreland, she picked Lamarius up at the intersection of Chicago and Cicero Avenues, in Chicago. Ms. Moreland attests that Lamarius was acting very nervously and declared that he had just killed someone. According to Ms. Moreland, she became very upset by Lamarius's admission and told him to get out of her car. She then dropped him off at a gas station at Cicero and Madison Avenues. Ms. Moreland affirms that she would have testified to these facts at Petitioner's trial, but she was never contacted by anyone representing Petitioner for an interview or to request her testimony.

15

Attached hereto as Exhibit C is an affidavit of Quinton Martell Davis. Mr. Davis states that he received a call from Lamarius Robinson on the night of December 3, 2008, after 9:15 p.m., requesting that Mr. Davis pick him up at a gas station at Madison and Cicero Avenues. Mr. Davis and his girlfriend then picked Lamarius up, and drove toward Mr. Davis's grandmother's house at 1517 South Central Park Avenue, in Chicago.

While on the way to Mr. Davis's grandmother's house, Lamarius told Mr. Davis that he had just shot "13". *See*, Ex. C. Lamarius told Mr. Davis that he was on Lawler when he saw "13" coming out of a house. *Id.* Lamarius told Mr. Davis that he ran up on "13" and shot him several times. *Id.* According to Mr. Davis's affidavit, Lamarius showed him a shiny chrome and black .45 handgun, which Lamarius said was the gun he had used to kill "13". *Id.* Lamarius admitted that he first called Jenee Moreland to pick him up, and then called Mr. Davis. *Id.*

Mr. Davis's affidavit also makes clear that Petitioner was not present when Lamarius killed Hanford. Rather, once at Mr. Davis's grandmother house, Mr. Davis called Petitioner to come over to the house. Mr. Davis was then present when Lamarius told Petitioner what he had done. *Id.*

Mr. Davis further attests that he spent the next few months with Lamarius, and that Lamarius had a very difficult time dealing with the fact that he had killed someone. In order to cope with the guilt, Lamarius began using more drugs. *Id.*

Mr. Davis also received a letter from Lamarius, different from the one defense counsel presented during trial, wherein Lamarius expressed his desire to

make things right for Petitioner being convicted of the murder of Hanford. A copy of the letter is attached to Mr. Davis's affidavit. Mr. Davis further attests that he would have provided all of this testimony at Petitioner's trial, but he was never interviewed by anyone representing Petitioner. *Id.*

The failure to present generally exculpatory evidence can amount to ineffective assistance of counsel. *Skinner*, 220 Ill.App.3d at 485-86. Specifically, evidence that a third party confessed to the offense on more than one occasion to multiple people is the most obvious example of exculpatory evidence, and the failure to present, or even explore it, establishes clear and prejudicial ineffectiveness. Moreover, this evidence cannot be shrugged off as inadmissible hearsay, such that counsel was excused from presenting it.

In *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038 (1979), as well as *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150 (1979), the United States Supreme Court established the principle that due process requires that the states "must allow defendants to put reliable third-party confessions before the jury, despite the hearsay rule, when necessary to assist in separating the guilty from the innocent." *Carson v. Peters*, 43 F.3d 384, 385 (7th Cir. 1994). The Illinois Supreme Court has embraced this principle and reversed convictions where such evidence was not admitted. *People v. Tenney*, 205 Ill.2d 411, 793 N.E.2d 571 (2002); *People v. Cruz*, 162 Ill.2d 314, 643 N.E.2d 636 (1994).

*Chambers* and its progeny have set forth a four factor guideline for determining the admissibility of third party confessions. The factors include: (1) the

statement was spontaneously made to a close acquaintance shortly after the crime; (2) the statement is corroborated by some other evidence; (3) the statement is self-incriminating and against the declarant's interest; and, (4) there was adequate opportunity for cross examination of the declarant. *Tenney*, 205 Ill.2d at 435. These four factors are merely guidelines and not requirements; not all four need be present for the proffered statements to be admissible. *Id.* Indeed, in *Tenney*, only the first three factors were present, yet the Illinois Supreme Court found sufficient reliability for the admission of the statements.

Here, as in *Tenney*, the statements of Lamarius to both Ms. Moreland and Mr. Davis meet the first three of the *Chambers* factors. Ms. Moreland is a close enough friend to Lamarius that he called her for a ride after 9:00 p.m. Likewise, Mr. Davis is a friend of Lamarius's for approximately twenty years, and someone with whom he would visit at his grandmother's home. There can be no question that Ms. Moreland and Mr. Davis are close acquaintances of Lamarius.

Likewise, Lamarius made the inculpatory statements to them within a very short time after the shooting. The statement to Ms. Moreland was literally made right after the offense, and the statement to Mr. Davis followed shortly thereafter.

The statements to these individuals are corroborated by each other as well as other evidence in the case. As this Court is aware, there was a letter which the defense claimed was authored by Lamarius wherein he admitted to the killing of Hanford. While that letter was ultimately not presented to the jury, it is corroboration of Lamarius's spontaneous statements on the night of the shooting.

In addition, in his statement to Mr. Davis, Lamarius displayed the handgun he used which fit the ballistics evidence presented at trial. And, the letter Lamarius later sent to Mr. Davis expressed his remorse for putting Petitioner in the position to be convicted of this offense.

With respect to the third factor, the statement is obviously self-incriminating and against Lamarius's interest. Indeed, when he was called by the state at Petitioner's trial, he invoked the Fifth Amendment and elected not to testify.

Due to that invocation, Lamarius is presumably able to prevent the state from cross examining him, but as in *Tenney*, the absence of this factor is not dispositive of the issue. The statements made to Ms. Moreland and Mr. Davis would have been properly admitted had defense counsel interviewed them as requested by Petitioner, and procured their testimony.

There can be no sound strategic reason to fail to at least interview these witnesses. They were available and willing to testify, and their testimony was highly relevant. The absence of their testimony was also extremely prejudicial to Petitioner's defense. In closing, the state argued to the jury that they never heard any testimony that anyone else was the shooter. (Tr. D11) Had this evidence been presented, such an argument would have been improper.

This evidence would have also provided Petitioner with an actual defense. As it was, trial counsel presented no evidence or testimony. Instead, he relied on the argument that Russell was lying, and that Russell and Guyton gave inconsistent versions of the events. Failing to interview and call these witnesses hamstrung the

defense into arguing that while Petitioner was present at the shooting, he was not the shooter.

Furthermore, the testimony of Mr. Davis and Ms. Moreland would have opened up a whole new line of defense that Petitioner was not present for the shooting. Coupled with the evidence that will be discussed later herein, there can be no excuse for counsel's failure to present this highly relevant and exculpatory testimony. An evidentiary hearing is necessary at which Petitioner can present evidence from the witnesses identified herein.

> 2.   **Latanya Fleming, Ethel Lewis and Quinton Davis would have provided Petitioner with an alibi.**

On the day of the shooting, Petitioner had taken his mother, Latanya Fleming, to work on December 3, 2008, at 2:30 p.m., and was supposed to pick her up when her shift ended at 9:00 p.m. *See*, Affidavit of Latanya Fleming attached hereto as Exhibit D; and Ex. A. Ms. Fleming was working at the Dominick's grocery store then located at Halsted Street and Madison Avenue, in Chicago. Petitioner went into the store at 9:00 p.m. to pick up his mother, at which time she told him she had just been asked to work until 10:30 p.m. *See*, Exs. A & D. Records of Ms. Fleming's employment on that day are attached to her affidavit. The records confirm that her shift was scheduled to end at 9:00 p.m., but that she ultimately worked until 10:30 p.m. Because his mother was not ready to leave, Petitioner purchased a candy bar and then waited in the car in the parking lot for his mother to finish. *See*, Exs. A & D.

While in the store, Ms. Fleming introduced Petitioner to her co-worker Ethel Lewis. Attached hereto as Exhibit E is the affidavit of Ms. Lewis. Ms. Lewis confirms in her affidavit that she had seen Petitioner in the store on prior occasions picking up Ms. Fleming. And, while she does not remember the exact date that she was formally introduced to Petitioner, it was a winter day later in the evening, possibly around 9:00 p.m. Furthermore, the day stands out in Ms. Lewis's mind because Petitioner came to pick Ms. Fleming up and then Ms. Fleming had to work longer, which was an uncommon occurrence. In addition, Ms. Lewis recalls that instance as being the last time she saw Petitioner in the store, and a few months later learning of his arrest from Ms. Fleming. Ms. Lewis affirms that she would have testified to these facts at Petitioner's trial had anyone approached her to do so.

In addition, as discussed previously, Quinton Davis could also have confirmed Petitioner's whereabouts at the time of the shooting. Mr. Davis attested that he was aware that Petitioner was picking his mother up from work at the time of the shooting. *See*, Ex. C.

The testimony of Petitioner's mother providing him with an alibi may not, by itself, be definitive evidence of Petitioner's whereabouts at the time of the shooting of Hanford. However, when Ms. Fleming's testimony is coupled with the testimony of Ms. Lewis, who remembers the circumstances of her introduction to Petitioner as it relates to him having to wait for his mother to finish an extended shift, it becomes highly compelling evidence.

The evidence at trial established that the shooting took place at 9:10 p.m., on

December 3, 2008. It would have been impossible for Petitioner to have learned at 9:00 p.m. when he was in the store that his mother would be working late, and then make it to the area of Iowa and Lawler in time to commit the offense.[2]

But the jury did not hear any of this evidence despite Petitioner advising his trial counsel to speak with his mother to establish his whereabouts at the time of the shooting. Had the jury heard that Petitioner was picking up his mother from work, supported by records and with corroboration from a disinterested witness, the testimony of Russell and Guyton would have been viewed with a great deal of skepticism, and deservedly so. Moreover, had trial counsel conducted the interview of Ms. Lewis closer in time to the events of the shooting, she may well have been able to recall the date specifically rather than merely remembering it based on the circumstances of Ms. Fleming's work schedule. Trial counsel never interviewed or presented the testimony of Ms. Lewis and did not call Ms. Fleming to testify either. Thus, the jury was left with only the testimony of the state's witnesses who placed Petitioner at the scene of the shooting.

In *Raygoza v. Hulick*, 474 F.3d 958 (7th Cir. 2007), the Seventh Circuit found that trial counsel's failure to call alibi witnesses prejudiced the defendant where "[t]he only evidence apart from the suppressed confession linking [defendant] to the

---

[2] Google Maps calculates the time to travel between these two points as being between 17 and 25 minutes depending on traffic. *See,* https://www.google.com/maps/dir/Madison+%26+Halsted/W+Iowa+St+%26+N+Lawler+Ave,+Chicago,+IL/@41.8853861,-87.7332472,13z/data=!3m1!4b1!4m13!4m12!1m5!1m1!1s0x880e2cc4b835e74d:0xd320e0fd8d8fff36!2m2!1d-87.647558!2d41.881853!1m5!1m1!1s0x880e3334a14a57ed:0x79f9cb7cd196e0c7!2m2!1d-87.7519676!2d41.8967788.

crime was eyewitness identification." *Id.*, at 965. There, counsel's decision to not call all of the available alibi witnesses was made after interviewing the witnesses and determining that each would be independently vulnerable during cross examination. *Id.*, at 962-964. Further, counsel in *Raygoza* did call defendant's girlfriend as an alibi witness to corroborate defendant's own testimony. Despite the fact that Raygoza's counsel made an informed decision to not call all the available alibi witnesses, the court found that this strategic decision constituted ineffective assistance of counsel. In reaching this conclusion, this Court stated:

> [A] trier of fact approaching the case with fresh eyes might choose to believe the eyewitnesses and to reject the alibi evidence, but this trier of fact never had the chance to do so. This undermines our confidence in the outcome of the proceedings so seriously that we conclude that there is a reasonable probability that the result would have been different had Raygoza's attorney presented the testimony of all or most of his alibi witnesses.

*Id.*, at 965.

The facts of this case are more egregious than those of *Raygoza*. Here, counsel did not interview the potential alibi witnesses. Thus, it cannot even be said that a strategic decision was made not to call them. The failure to present an alibi becomes more egregious when considered with the fact that defense counsel was aware that another person had claimed responsibility for the offense. In light of that information, the failure to conduct an investigation of alibi witnesses is even more egregious. An evidentiary hearing is necessary at which Petitioner can present evidence from the witnesses identified herein, after which Petitioner is entitled to a new trial with representation by effective counsel.

23

### 3.    Johntay Washington, Ozell Jackson, and Aaron Marshall would have impeached the testimony of Oscar Russell.

During Oscar Russell's interview by police, his handwritten statement, and again in his grand jury testimony, Russell claimed that other individuals were on the street with him when he witnessed the shooting of Hanford. Russell identified these individuals as "Tay", "Ozell", "Big Shorty" and "Feb". According to his handwritten statement, he also identified mug shots of these individuals.

Petitioner informed his trial counsel that these supposed witnesses where Johntay Washington ("Tay"), Ozell Jackson ("Ozell"), Jamion Winters ("Big Shorty"), and February Burage ("Feb"). *See*, Ex. A. These individuals were also named in the police report interview of Russell, and a General Progress Report generated by the police. Petitioner further informed his trial counsel that these individuals would be willing to testify at Petitioner's trial that they were not present for the shooting of Hanford. Nonetheless, none of these men were called to testify at Petitioner's trial, nor did defense counsel speak with them.

Russell's handwritten statement also reflects that the source of animosity between Hanford and Petitioner was due to an argument that arose between Hanford's chief, "10-4", during which Hanford called Petitioner a "bitch." Russell reiterated this claim before the grand jury when he testified that a couple of weeks before the death of Hanford, Petitioner and Hanford's chief had an argument over drug turf. Petitioner advised his counsel to speak with Aaron Marshall, a.k.a. "10-4", who would affirm that no such fight ever occurred. Again, trial counsel failed to

24

interview or speak with Mr. Marshall about his potential testimony on Petitioner's behalf.

Attached hereto as Exhibit F is the affidavit of Johntay Washington. Mr. Washington affirms that he was not present at the time Hanford was shot. Indeed, he admits that he was taken into custody a week or two after the shooting and interrogated by the police about Russell's claims that he had witnessed the shooting. Mr. Washington informed the police at that time that he was not present and had no information about the shooting of Hanford. Mr. Washington attests that anyone who claimed he was present was not telling the truth. Furthermore, Mr. Washington attests that no attorney or investigator working for Petitioner ever contacted him about testifying at Petitioner's trial, but that had he been contacted, he would have testified as set forth in the affidavit.

Similarly, attached hereto as Exhibit G is the affidavit of Ozell Jackson.[3] Mr. Jackson makes clear in his affidavit that not only was he not present on the street when Hanford was shot, he was actually incarcerated in the Juvenile Temporary Detention Center ("Audy Home") at the time. It was not until after Christmas 2008, when he had been released from the Audy Home, that he learned of the death of Hanford. Then, according to Mr. Jackson, he heard from Oscar Russell himself, as well as from many others, that the person who killed Hanford was Petitioner's

---

[3] Counsel spoke with Mr. Jackson on June 16, 2014, and sent him the attached affidavit the same day based on that conversation. Mr. Jackson, who is incarcerated at Western Illinois Correctional Center in Mt. Sterling, Illinois, informed counsel he would execute the affidavit and return it as soon as possible. Counsel will supplement this petition with the executed affidavit once it is received.

cousin, Lamarius Robinson. Mr. Jackson attests that he was never contacted by any attorney or investigator on Petitioner's behalf, but that had he been, he would have testified that he did not witness the shooting and anyone claiming otherwise was lying.

Finally, attached hereto as Exhibit H is the affidavit of Aaron Marshall, a.k.a. "10-4". As Mr. Marshall's affidavit makes clear, two weeks prior to the death of Hanford, he was taken into custody and stayed at the Cook County Jail until June 12, 2009. Mr. Marshall affirms that he was not present for any argument between himself, Hanford and Petitioner, nor did any such argument occur. Indeed, Mr. Marshall makes clear that he has never had anything but an amicable relationship with Petitioner. Mr. Marshall also attests that he discussed his willingness to testify on Petitioner's behalf at trial, but he was never contacted by anyone representing Petitioner.

It is clear that the testimony of these three men would have greatly undermined the credibility of Russell. In this case, Russell's testimony was virtually unchallenged other than the suggestion that he was treated poorly by the police when he was brought in for questioning. Evidence that two of the people he claimed also witnessed the shooting were not present, and one was even in custody, would have eviscerated his credibility in the eyes of the jury.[4] This is also true of

---

[4] Counsel spoke with February Burage, who is incarcerated at the Dixon Correctional Center, on June 23 2014. Mr. Burage informed counsel that he would like to speak with his own attorney, and would then have his attorney contact undersigned counsel. With respect to Jamion Winters, counsel has thus far been unable to locate him, but efforts continue.

the testimony of Mr. Marshall. Russell's whole claim as to why Petitioner would have any motive for shooting Hanford is completely discredited by Mr. Marshall's testimony.

In *Malone v. Walls*, 538 F.3d 744 (7th Cir. 2008), the Seventh Circuit noted that eyewitness testimony was the crux of the state's case, and all of the eyewitnesses had vulnerabilities in identifying the defendant's alleged role in the offense. *Id.*, at 760. Thus, the state appellate court's conclusion that trial counsel was not ineffective for failing to present certain exculpatory witness was unreasonable. Such a conclusion, could only be reached by turning a "blind eye" to the nature of the evidence against the defendant and the significance of the witnesses's exculpatory testimony. *Id.*

Likewise, in *Stanley v. Bartley*, 465 F.3d 810 (7th Cir. 2006), the Seventh Circuit noted that the failure to interview any witnesses or prospective witnesses was "a shocking dereliction of professional duty in a case in which the state's evidence... was far from compelling." *Id.*, at 813. There, the court noted that just because counsel had a police report summarizing a witness's statement, the attorney could not know how complete or accurate that statement was without interviewing the witness himself. *Id.*

There is no legitimate excuse for trial counsel's failure to speak with or call these witnesses in Petitioner's case. An evidentiary hearing is necessary at which Petitioner can present evidence from the witnesses identified herein.

27

**B.** **Trial counsel was ineffective for failing to demonstrate the authenticity of the letter written by Lamarius Robinson wherein Lamarius admitted to having committed the shooting.**

Just before jury selection in this case, defense counsel announced his intention to call Lamarius Robinson to testify, and to introduce a letter counsel alleged was written by Lamarius wherein he admitted that he shot Hanford and Petitioner did not. A copy of the letter, which was never made part of the trial record, is attached hereto as Exhibit I. When the letter was first raised as an issue, the court questioned whether the "only way to be able to prove up that he [Lamarius], in fact, was the author of the letter was for him to testify. Am I correct?" (Tr. A18) Ultimately, the court tabled the issue to be discussed again once it was known whether or not Lamarius would testify or plead the Fifth Amendment.

Two days after the court's initial comment about the admissibility of the letter, the state announced its intention to call Lamarius to testify in the state's case in chief. Prior to the state calling him, Lamarius was allowed to speak with a Public Defender, and elected to invoke the Fifth Amendment. The State proffered that they had spoken with Lamarius, and he denied writing the letter. (Tr. C155) Defense counsel also proffered that he spoke with Lamarius, and Lamarius "hemmed and hawed a bit" but ultimately denied writing the letter. (Tr. C155)

Lamarius then took the witness stand outside the presence of the jury. He denied being present for the shooting of Hanford, and denied writing the letter to Petitioner admitting to killing Hanford. (Tr. C159) Lamarius did admit, however,

28

that it was probably his writing on the envelope in which the letter came. (Tr. C160)

The court then excused Lamarius and ruled that he had a Fifth Amendment right, and he would not be allowed to testify before the jury. (Tr. C163) The court asked defense counsel if he had any argument with respect to the letter. (Tr. C163) Defense counsel made no argument about getting the letter into evidence. The court indicated that it would give defense counsel another opportunity to make any argument about the letter's admissibility during the defense case in chief. (Tr. C166) When later asked by the court after the state rested if Lamarius was needed for anything further, defense counsel said, "Based on the court's ruling no." (Tr. C196)[5]

Had counsel conducted a modicum of research in the two days since the court's comments regarding the letter's admissibility, or prior to that, counsel would have realized that Lamarius's testimony was not necessary in order to authenticate the letter. In order to authenticate handwriting, the proponent of the evidence need only "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed.R.Evid. Rule 901(a).[6] As such, several ways exists to

---

[5] While it is unclear to what ruling defense counsel was referring, it would appear that it was to the court's ruling that Lamarius had a Fifth Amendment right not to testify. The court's questions as to the admissibility of the letter were left open for defense counsel to argue or present case law, neither of which he did.

[6] Effective January 1, 2011, Illinois adopted certain Federal Rules of Evidence as the new Illinois Rules of Evidence. Rule 901 is one such rule, which was effective at the time of Petitioner's trial.

make this showing: (1) testimony that a matter is what it is claimed to be; (2) a nonexpert opinion as to genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation; (3) a comparison by the trier of fact or by expert witnesses with specimens which have been; or, (4) the appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances. Ill.R.Evid. Rule 901(b)(1)-(4); *Board of Education of DuPage High School Dist. 88 v. Pollastrini*, 2013 IL App (2d) 120460, ¶87 (Birkett, J., specially concurring); *People v. Williams*, 274 Ill.App.3d 598, 608, 653 N.E.2d 899 (1st Dist. 1995); *People v. Faircloth*, 234 Ill.App.3d 386, 392, 599 N.E.2d 1356 (3rd Dist. 1992). Indeed, proof of handwriting is not necessary to authenticate a private letter; it can be made by circumstantial evidence. *Faircloth*, 234 Ill.App.3d at 392.

In *Faircloth*, the state introduced letters purportedly written by the defendant, and the appellate court found the circumstantial evidence that the defendant was the author to be overwhelming. That evidence included: the return address coming from the jail the defendant was housed; they were written in response to letters sent by the person to whom they were addressed; they were signed with the defendant's name; the letters discussed subjects only the defendant knew about including details of the night the victim died; and, the defendant discussed the contents of the letters with the addressee on the telephone. *Id.*

In *Williams*, the state introduced a map into evidence that had been mailed to the witness from the defendant. She testified that she was familiar with the

30

defendant's handwriting, and that the handwriting on the map was his. *Williams*, 274 Ill.App.3d at 608. The appellate court agreed that this testimony was sufficient to authenticate and identify the defendant's handwriting on the map. *Id.*

In *United States v. Spano*, 421 F.3d 599 (7th Cir. 2005), the Seventh Circuit was faced with the argument that the defendant's signature on checks were forgeries. A known sample of the defendant's signature was also introduced, but no handwriting expert or person familiar with the defendant's handwriting was called to testify. *Id.*, at 604. According to the Seventh Circuit, a jury is competent to determine the genuineness of a signature by comparing it to signature known to be genuine. *Id.*, at 605.

It is clear that had defense counsel conducted any research whatsoever, he would have discovered many other ways in which to authenticate the letter written by Lamarius. Indeed, had he interviewed Quinton Davis, a long time friend and close acquaintance of Lamarius's, he could have identified the handwriting as Lamarius's as he says in his affidavit. *See*, Ex. C. In addition, in that Lamarius admitted that he probably wrote the envelope that the letter came in, this is further circumstantial evidence of its authenticity. Or, as in *Spano*, defense counsel could have requested the court to compel Lamarius to submit a handwriting sample,[7] which the jury could have then compared to the letter purportedly written by him. Or, counsel could have used other letters also written by Lamarius, such as the one

---

[7] No Fifth Amendment privilege is infringed from the taking of a handwriting sample. *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951 (1967).

attached hereto as Exhibit J, where internal consistencies in the handwriting can be seen. For example, Lamarius apparently favors writing his lowercase "f" backwards, writing "fill" when he means "feel", or writing "um" when he means "I'm".

Authentication of the letter was actually a fairly easy proposition had defense counsel made any effort whatsoever to gain its admission. The testimony of Lamarius was not the only way to authenticate the letter. Counsel's failure to explore other avenues for its admission once the court suggested on the first day of trial that Lamarius had to testify to get the letter in was a complete dereliction of counsel's duties to present a defense.

Indeed, it is clear that counsel had no other defense prepared, and was apparently relying solely on his ability to get Lamarius to admit to having written the letter. Being on notice on the first day of trial that Lamarius may not testify, or may not claim authorship of the letter, there is simply no excuse for why two days later counsel had no other arguments for how the letter was admissible in the absence of Lamarius's testimony.[8] This is particularly when the arguments were so readily attainable, and the court had invited counsel to weigh in further on the matter and present arguments on the letter's admissibility.

Once authenticated, defense counsel also had to establish that the letter was not hearsay. As discussed Section III.A.1, *supra*, the letter would fit the guidelines

---

[8] Counsel should also have considered, pretrial, that Lamarius might decline to testify or might disavow the letter because the letter confessed to a murder.

32

of *Chambers*, thus supporting its admissibility. The letter was dated January 21, 2010, a little over a year after the offense. It was corroborated by other evidence in the case that was or could have been presented, including the statements of Lamarius immediately after the shooting that he had killed Hanford and eyewitness testimony that Lamarius pointed a gun at a third party in the same area shortly before the shooting of Hanford.

The letter was also very clearly a statement against interest. A direct quote from the letter is "what um sayn is I did it you wasn't even there I could do the time cuz its minds anyway". The letter later says "I licked the page at the bottom so ma DNA could be on here even if you have 2 use this". Then there is a circled area at the bottom of the page where the letter was apparently licked. *See,* Ex. I.

As discussed previously, *Chambers* makes clear that due process requires that the states "must allow defendants to put reliable third-party confessions before the jury, despite the hearsay rule, when necessary to assist in separating the guilty from the innocent." *Carson v. Peters*, 43 F.3d 384, 385 (7th Cir. 1994). Here, counsel's failure to obtain the admission of the letter into evidence has resulted in the conviction of an innocent man. Furthermore, without this evidence, the state was able to argue that there was no evidence that anyone else was the shooter.

Petitioner is entitled to a new trial where he can present evidence that Lamarius confessed to killing Hanford in the letter Lamarius sent to Petitioner.

C. **Trial counsel was ineffective for failing to object to the introduction into evidence of prior consistent statements of Guyton.**

During the direct examination of Deandre Guyton, the state asked him numerous questions about the substance of his grand jury testimony. While some of the prior testimony involved matters which Guyton denied making at trial, many of the questions were simply prior consistent statements. Despite the inadmissibility of these prior consistent statements, trial counsel voiced no objection to their admission into evidence.

"A witness may not be corroborated on direct examination by proof of prior statements consistent with his testimony." *People v. Williams*, 147 Ill.2d 173, 227, 588 N.E.2d 983 (1991). Likewise, use of a prior inconsistent statement to impeach a witness does not render admissible portions of the prior statement that are not inconsistent. In other words, the prior consistent portions of the statement remain inadmissible. *Id.*

Here, during Guyton's direct examination, he tried to qualify his grand jury testimony about whether or not he saw Petitioner shoot Hanford. Guyton did not, however, dispute many of the things he stated in the grand jury. The state at trial, however, repeated those consistent statements nonetheless.

For example, Guyton testified at trial that he saw fire come from the gun and Hanford get shot. (Tr. B120) Despite this unequivocal testimony, the state proceeded to introduce his grand jury testimony where in he testified that he saw fire coming from the gun and the bullets hit Hanford. (Tr. B137) Likewise, Guyton

testified at trial that he made a statement to the police and the ASA at the police station, that he was treated fine and that no threats or promises were made to him. (Tr. B128) Nonetheless, the state admitted Guyton's grand jury testimony wherein he testified that he spoke with the police and the ASA at the police station, he did so of his own free will, and no threats or promises were made to him. (Tr. B139-B141)

Not once during the review of Guyton's grand jury testimony did defense counsel object to the impropriety of the admission of the prior consistent statements. "[C]orroboration by repetition 'preys on the human failing of placing belief in that which is most often repeated.'" *People v. Lambert*, 288 Ill.App.3d 450, 458, 681 N.E.2d 675 (2nd Dist. 1997), *quoting*, *People v. Hudson*, 86 Ill.App.3d 335, 340 (1980) (internal quotations omitted). Plainly stated, repetition does not bestow credibility, which should instead depend on the inherent trustworthiness of the story, not on the number of times the witness has repeated the story. *Id.*

Just because Guyton stated more that once that he saw fire come from the gun does not make it more likely to be true. Nor does the fact that he previously admitted to being treated fine by police and an ASA, or that no threats or promises were made to him, make it so. This is not a situation where defense counsel impeached the witness on these bases and the state needed to rehabilitate his testimony on these points. Quite to the contrary, this occurred on direct examination before defense counsel had risen to ask a single question of Guyton. Defense counsel's failure to object to the introduction of the inadmissible statements

is unexplained by the record, and no strategic reason could possibly exist for the failure to object.

To the extent this issue could have been raised on direct appeal, appellate counsel was ineffective for failing to raise it. The improper bolstering of Guyton's testimony no doubt impacted the weight of the evidence against Petitioner. Guyton was a purported eyewitness whose credibility was weak to say the least. Sitting idly by while the state bolstered their own witness's testimony was a prejudicial mistake on trial counsel's part.

**D.  Trial counsel was ineffective for failing to object to the introduction of other crimes evidence through the testimony of Detective McDermott.**

During the trial testimony of Detective Timothy McDermott, evidence was introduced that Petitioner was a drug dealer who employed Russell as his seller. McDermott also testified that Guyton decided to come forward because he no longer wanted to take care of the "gang bangers" who killed Hanford himself.  (Tr. C111) This evidence had nothing whatsoever to do with the facts of the case, and was in no way related to the circumstances of Hanford's death.  Nonetheless, trial counsel failed to object to the admission of the other crimes evidence as inadmissible and prejudicial, and did not request a limiting instruction.  Furthermore, trial counsel even revisited the issue on cross examination, reinforcing the fact that Petitioner was a drug dealer.

Evidence of other crimes is not admissible if its only purpose is to prove the propensity of the defendant to commit crime. *People v. Kliner*, 185 Ill.2d 81, 146,

705 N.E.2d 850 (1998). "'This type of evidence is prejudicial because a jury might convict the defendant because it believes that he is a bad person and deserves punishment.'" *People v. Boand*, 362 Ill.App.3d 106, 124, 838 N.E.2d 367 (2nd Dist. 2005), *quoting*, *People v. Tolbert*, 323 Ill.App.3d 793, 796, 753 N.E.2d 1193 (5th Dist. 2001). Other crimes evidence is only admissible where it is relevant and aids in the establishment of a material question other than propensity. *Kliner*, 185 Ill.2d at 146. Normally, a judge weighs the probative value of the other crimes evidence against the prejudicial effect to determine the admissibility of the evidence. *Id.*

Here, defense counsel made no objection to the introduction of evidence that Petitioner was a drug dealer, and that he was "gang banger." Nor did counsel request a limiting instruction to advise the jury that such evidence should not be used to establish Petitioner's propensity to commit crime.

Instead, counsel went over Russell's prior handwritten statement on cross examination where he described Petitioner as someone for whom Russell sold drugs. Using the prior consistent statement to reinforce the testimony that Petitioner was a drug dealer is further evidence of counsel's incompetence.

Furthermore, the evidence that Petitioner was a gang banging drug dealer undoubtedly left the jury with the impression that Petitioner's motive for the purported killing of Hanford was either drug or gang related, or both. Aside from this evidence, there was no motive offered for the shooting other than Hanford was a friend of an individual that Petitioner's cousin had previously tried to shoot.

In addition, this evidence was entirely unnecessary to explain the sequence of

events or circumstances surrounding the incident. Russell testified that he knew
Petitioner from contact on the streets. The matter could have simply been left at
that. Likewise, McDermott could have merely testified that Guyton decided to help
the police because he no longer wanted to take care of things himself. The
gratuitous addition of nonessential facts of Petitioner's purported other crimes or
bad behavior was entered into evidence despite having no legitimate purpose.

Had the court been given the opportunity to weigh the probative value
against the prejudicial effect of the other crimes evidence, the court would have
undoubtedly barred it. Trial counsel's failure to object to the admission of this
evidence could not have been strategic, and instead greatly prejudiced Petitioner's
defense.

In addition, appellate counsel was ineffective for failing to raise this issue on
direct appeal. The failure of trial counsel to object to the improper admission of this
prejudicial evidence was an issue that could have been raised on direct appeal, but
was not. Had this issue been raised on direct appeal, there is a strong probability
that Petitioner's appeal would have been granted and the matter sent back to this
Court for a new trial without admission of the improper evidence.

**IV. Trial counsel was ineffective for failing to object to the continued
inclusion of Juror Mann on the jury after he rode to court with an ASA,
where counsel failed to ask any questions that might have revealed
improper communications or partiality on Juror Mann's behalf.**

During Petitioner's trial, Juror Mann requested and received a ride to court
from an Assistant State's Attorney who was not one of the ASAs trying the case

38

against Petitioner. When the court learned of the ride sharing, Juror Mann was questioned briefly, and he indicated that he and the ASA did not discuss the case, and his friendship with the ASA would not impact his fairness. Defense counsel asked no questions of Juror Mann, made no objection to his continued inclusion on the jury, and did not ask that the ASA be questioned concerning the events of the ride sharing.

It is well settled that in order to protect a defendant's constitutional right to a fair trial, "[p]arties or other persons connected with a case or having some interest therein... should carefully avoid private conversations and social intercourse with jurors." *People v. Burns*, 304 Ill.App.3d 1, 6, 709 N.E.2d 672 (1st Dist. 1999). Furthermore, the burden rests with the state to establish that such contact with jurors was harmless to the defendant. *People v. Harris*, 123 Ill.2d 113, 132, 526 N.E.2d 335 (1988); *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450 (1954).

In this instance, the state made no effort to establish that the contact between an ASA and one of the jurors deciding Petitioner's fate was harmless to Petitioner. Indeed, all that was conducted was the most cursory and vague of examinations by the court. Nonetheless, defense counsel failed to object to the procedure in which the matter was handled. The ASA who shared a ride with Juror Mann was never questioned by defense counsel or the court.

All that was asked of Juror Mann was whether any discussions of the case occurred. But that inquiry failed to address all of the potential topics that might have been discussed. For example, the record is silent on whether Juror Mann and

the ASA discussed the attorneys involved in the case, and any opinions Juror Mann may have formed about them. Likewise, the record does not establish whether the ASA discussed his relationship with the two ASAs who were prosecuting Petitioner. There could also have been discussions about the judge, or generally how trials are conducted that would have given Juror Mann information about the process that the jurors would not otherwise have known.

The possibilities of how Juror Mann's ride sharing with an ASA could have impacted Petitioner's case are numerous outside of the very basic inquiry of whether or not they discussed the case. But that was the extent of the inquiry conducted here. As *Remmer* makes clear, a more meaningful hearing should have been held to determine the harmfulness to Petitioner of the improper contact. *Remmer*, 347 U.S. at 229. Defense counsel failed to request such a hearing, and was ineffective for failing to do so. An evidentiary hearing should be granted where Juror Mann, ASA Jeff Allen, and trial counsel can testify to make a more complete record on this matter.

In addition, appellate counsel was ineffective for failing to raise this issue on direct appeal. The insufficiency of the trial court's inquiry was an issue that could have been raised on direct appeal, but was not. Had this issue been raised on direct appeal, there is a strong probability that Petitioner's appeal would have been granted and the matter sent back to this Court for an evidentiary hearing on the improper contact, and ultimately a new trial with an impartial jury.

40

## V.     Robinson's Petition Contains Newly Discovered Evidence of His Actual Innocence.

Since the time of Petitioner's trial, one of the so-called eye witnesses against him, Oscar Russell, has come forward and repudiated his identification of Petitioner as the shooter.   A copy of Russell's affidavit is attached hereto as Exhibit K.  As the Illinois Supreme Court has held, a claim of actual innocence based on newly discovered evidence implicates a defendant's right to due process under the Illinois Constitution which is cognizable on a post-conviction petition.  *People v. Washington*, 171 Ill.2d 475, 665 N.E.2d 1330 (1996).  When such evidence is presented, a defendant is entitled to a new trial at which the newly discovered evidence can be considered by the jury.  *Id.*, at 489.

The due process clause of the Illinois Constitution permits a post-conviction petitioner to assert a freestanding claim of actual innocence based on newly discovered evidence.  *People v. Morgan*, 212 Ill.2d 148, 154 (2009).  The newly discovered evidence on which such a claim is based must be "evidence that was not available" at Petitioner's original trial, and that Petitioner "could not have discovered sooner through diligence."  *Id.*  The evidence must also be material, noncumulative, and "of such conclusive character that it would probably change the result on retrial."  *Id.*

Here the new evidence consists of the affidavit of Oscar Russell, the state's main witness against Petitioner.  In his affidavit, Russell states that he was forced to make the statements against Petitioner or he would face charges of his own.

41

Based on his prior drug record, Russell was told by police that a subsequent charge would result in extensive time in prison. Furthermore, he was told that if he did not testify consistently at Petitioner's trial, the sentence he was then serving could be extended or the old drug charges reinstated.

It was only due to this pressure that Russell agreed to identify Petitioner as the shooter in this case. As Russell makes clear in his affidavit, he did not witness the shooting of Hanford, and has no personal knowledge of who the shooter was. He never saw any of the things he testified to having seen.[9]

Furthermore, the testimony of Russell could not have been procured sooner. Russell's affidavit makes clear that he continued to maintain his story against Petitioner out of fear for his own future. It was only after having the time to consider what he had done that Russell was willing to come forward and correct the error in judgement he made in agreeing to falsely identify Petitioner as the shooter of Hanford.

Without the testimony of Russell, the state's evidence against Petitioner was virtually non existent. Guyton repudiated his identification of Petitioner as the shooter during his trial testimony, instead stating that he never saw Petitioner actually shoot Hanford, only that the shots came from the direction which Petitioner and his cousin were standing.

When the new evidence proffered by Russell is considered in conjunction with

---

[9] That Russell did not see what he originally claimed is corroborated by the affidavits of the individuals Russell claims witnessed the shooting along with him. As discussed herein, these individuals were not present.

the extensive evidence previously discussed, and which trial counsel failed to procure and present to the jury, there is little doubt that Petitioner would be acquitted at a retrial. Petitioner has evidence that he was not present at the time of the shooting; that Lamarius admitted to the shooting to two separate individuals very shortly after the incident; that Lamarius admitted to the shooting in a letter authenticated by a third party familiar with his handwriting; and, that Lamarius expressed remorse for having gotten Petitioner convicted for this crime. Petitioner is entitled to a new trial where he can present the affidavit of Russell where he repudiates his identification of Petitioner as the shooter in this case.

WHEREFORE, Petitioner respectfully requests this Court grant his Petition for Post-Conviction Relief, reverse his conviction, order a new trial, or grant him an evidentiary hearing to further support the allegations contained herein.

Respectfully submitted,

JODI L. GARVEY, One of the Attorneys for Petitioner.

BLEGEN & GARVEY
53 West Jackson Boulevard, Suite 1437
Chicago, Illinois 60604
(312) 957-0100

## CERTIFICATE OF SERVICE

**JODI L. GARVEY,** attorney at law, hereby certifies that on June 24, 2014, she served, or caused to be served, the foregoing Petition for Post-Conviction Relief upon the Cook County State's Attorney's Office, by hand delivery.

JODI L. GARVEY