# EXHIBIT 2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | No. 09 CR 6422 |
| | ) | Judge Mary M. Brosnahan |
| ALLEN ROBINSON, | ) | |
| | ) | |
| Petitioner. | ) | |

## PETITION FOR POST-CONVICTION RELIEF
## & REQUEST FOR AN EVIDENTIARY HEARING

Petitioner, **ALLEN ROBINSON**, by and through his attorneys, **BLEGEN &
GARVEY**, pursuant to 725 ILCS 5/122-2.1, as well as the Due Process, Equal
Protection, and Effective Assistance of Counsel provisions of the Fifth, Sixth and
Fourteenth Amendments to the Constitution of the United States and Article One,
Sections Two and Eight of the Constitution of the State of Illinois, respectfully
submits the following Petition for Post-Conviction Relief.

## I.    Procedural Background

On June 23, 2011, Petitioner was convicted following a bench trial of first
degree murder by personally discharging a firearm.  The charges arose from the
shooting death of Christopher Hanford on the night on December 3, 2008.  After the
denial of post-trial motions, Petitioner was sentenced by this Court to fifty-five (55)
years in the custody of the Department of Corrections.

On April 23, 2013, Petitioner's conviction was affirmed by the Illinois
Appellate Court, First District.  Leave to appeal to the Illinois Supreme Court was
denied on September 25, 2013.

**Robinson 002605**

Petitioner is currently serving the custodial portion of his sentence at the Menard Correctional Center, Inmate No. R67377. This petition is timely filed on or before June 24, 2014.

## II.  Statement of Facts

On June 20, 2011, Petitioner's trial commenced.  Just prior to jury selection, defense counsel announced his intention to call Lamarius Robinson, a.k.a. "Mard", "Mardi" or "Mari", Petitioner's cousin, to testify for the defense, and to introduce a letter counsel alleged was written by Lamarius.  In the letter, Lamarius admitted that he shot Hanford, that Petitioner did not, and that Petitioner was not even present at the time of the shooting.  The court questioned whether the "only way to be able to prove up that he [Lamarius], in fact, was the author of the letter was for him to testify. Am I correct?"  (Tr.A18)  Neither side stated whether the court was correct or not.  Ultimately, the court tabled the issue to be discussed again once it was known whether or not Lamarius would testify or plead the Fifth Amendment.  The jury was then selected.

The following day, the State began the presentation of its evidence with Norma Wilson, the grandmother of the deceased.  Ms. Wilson testified as to Christopher Hanford's appearance in life, and his appearance in death.  (Tr. B20-22) She also testified that on December 3, 2008,  Hanford left her residence at 6:30 or 7:00 p.m. to go to his friend Dre's house.  (Tr. B21)

Oscar Russell testified for the State that he was in the area of Iowa Street and Lamon Avenue, in Chicago, at 7:00 a.m., on December 3, 2008, selling narcotics. (Tr.

2

**Robinson 002606**

B28-B29) After 9:00 p.m. that day, Russell testified that he saw Petitioner and

Petitioner's cousin, who Russell knew as "Mard", in the same area. At that time,

Mard was waving a black handgun. (Tr. B33) While the three of them were standing

on the street, a man in a car drove by and said "dude down the street." (Tr. B34)

According to Russell, all three men walked down Iowa toward Lawler Avenue. (Tr.

B34-B35)

Russell testified that once they got to Lawler, he observed a group of people

standing on the corner, including Hanford. (Tr. B36) Russell claimed that Petitioner

and Hanford began arguing and then a physical altercation ensued. (Tr. B36)

According to Russell, during the fight, Mard pulled out a handgun and told Hanford's

friends not to jump into the fight. (Tr. B37) Russell claimed that during the fight

Hanford was getting the best of Petitioner, so Petitioner grabbed the gun from Mard

and shot Hanford several times. (Tr. B37-B38) Russell testified that he then ran

toward Iowa and Lamon. (Tr. B39)

According to Russell's testimony, he went to the Chicago Police Department

located at Area Five the next day. While there, he viewed two photo arrays, and

identified Petitioner in one and Mard in the other. (Tr. B41-B42) On March 3, 2009,

Russell testified that he again went to the police station and told police the same

thing. (Tr. B47) Finally, Russell testified that on March 30, 2009, he appeared in the

grand jury and testified that Petitioner was the shooter. (Tr. B48)

On cross examination, Russell testified that he had four prior narcotic

possession convictions, and that he was currently in the Illinois Department of

3

**Robinson 002607**

Corrections after having been convicted of Aggravated DUI. (Tr. B53) With respect to his interviews by police regarding the shooting of Hanford, Russell testified that each time he was brought to the station by police in handcuffs and placed in a locked interview room where he remained handcuffed. (Tr. B56) Russell testified that he was not free to leave, and he thought he was under arrest. (Tr. B57)

According to Russell, on the night of the shooting, there were at least seventeen to eighteen people on the street corner when Hanford was shot. (Tr. B68) Russell testified that he was on the other side of the street from Petitioner, Mard and Hanford. (Tr. B69) Russell testified that Mard and Petitioner were facing away from him with the gun, and that he took off running when he heard gun shots. (Tr. B72)

On re-direct, Russell testified that no threats or promises were made to him in relation to his testimony. (Tr. B75) According to Russell, he saw Petitioner shooting the gun after having taken it from Mard. (Tr. B78-B79)

The state also called Deandre Guyton. According to Guyton, he had known Hanford from the neighborhood for 3-4 years prior to the shooting, and they were friends. (Tr. B110) On the night of December 3, 2008, at approximately 8:30 p.m., Guyton testified that he was walking around the neighborhood alone when someone with a gun ran up to him. (Tr. B110) Guyton testified that the person was Mard, who he knew as Petitioner's cousin, and another person was with Mard, but it was not Petitioner. (Tr. B113) According to Guyton, Mard put the gun to his face and tried to shoot, but the gun did not go off. (Tr. B114) Guyton tried to grab the gun, and then tried to use the person with Mard as a shield. (Tr. B115) When it was clear that

4

Robinson 002608

Mard could not get the gun to work, Guyton testified that he got up and ran back to his house. (Tr. B116)

Guyton testified that once at home, he called Hanford to tell him what happened. (Tr. B117) According to Guyton, Hanford was on his way to Guyton's house, so Guyton went outside to wait for him. (Tr. B118) Guyton testified that when he saw Hanford walking toward his house, there were 3-5 other people outside too. (Tr. B118) According to Guyton, Hanford never made it to Guyton's house because he was shot at Lawler and Iowa before arriving. (Tr. B118-B119) Guyton testified that he saw five guys walk up to Hanford, but that he did not see who shot Hanford. (Tr. B119-B120) Guyton said Petitioner and Mard were present, however. (Tr. B120)

Guyton testified that the police grabbed him the next day and showed him a photo array, but he refused to sign it. (Tr. B121) According to Guyton's testimony, the police grabbed him again three months later, and he signed a photo array identifying Petitioner. (Tr. B123) Guyton clarified his statement to police by testifying that he told them Petitioner was *with* whoever shot Hanford, not that Petitioner shot Hanford. (Tr. B123)

Guyton further refuted some of the statements contained in the type-written statement attributed to him by an Assistant State's Attorney. According to Guyton, it was his recollection that he told the ASA that the gun shots came from the direction Petitioner was standing, and that he did not say he saw Petitioner holding the gun. (Tr. B129-B130)

Guyton then testified about the contents of his grand jury testimony. (Tr.

5

Robinson 002609

B135-B142) According to Guyton's grand jury, he saw no one with a gun other than Petitioner, and that he saw Petitioner raise the gun and start shooting. (Tr. B136, B138)

Guyton testified that he had a child with a woman named Shanice Johnson, and that Petitioner also had a child with Ms. Johnson. (Tr. B153) He further testified that he told police that he would not sign the photo array because he did not want his name involved in a murder. (Tr. B152)

On cross examination, Guyton testified that he saw Hanford get shot, but he did not see who did the shooting. (Tr. B158) When he was interviewed by police on March 3, 2009, Guyton testified that he was arrested at a traffic stop, and then taken to Area Five. (Tr. B163-B164)

With respect to the night of the shooting, Guyton testified on cross examination that when Mard approached him with a gun, he was with another man who was not Petitioner. (Tr. B169) Later, when Hanford was shot, Guyton testified that there were only five guys on the street, and that no fight took place prior to the shooting. (Tr. B174)

The State called two of the ASAs who interviewed Guyton. ASA Melissa Meana testified that she interviewed Guyton at the Area Five police station on March 3, 2009. (Tr. B191) According to Meana, Guyton said that Petitioner shot Hanford, and Mard was present. (Tr. B192) Meana testified that she then typed up Guyton's statement, reviewed it with him and had him sign it. (Tr. B193-B195)

Meana testified on cross examination that Guyton told her nothing about a

6

Robinson 002610

fight having occurred prior to the shooting, as Russell claimed to have witnessed, or that Petitioner supposedly grabbed a gun from Lamarius Robinson ("Mard"), which Russell also claimed to have seen. (Tr. B209)

Prior to the testimony of the second ASA, the court was notified that one of the jurors (Juror Mann) had received a ride to court from an ASA not assigned to the case. (Tr. C3) The court questioned Juror Mann about the circumstances of the ride, and Juror Mann stated that no discussions of the case were had with the ASA. (Tr. C4) Juror Mann was not asked any questions about his relationship with the ASA, nor the substance of any of their conversations in the car. Indeed, defense counsel voiced no objection whatsoever.

ASA Tene McCoy-Cummings testified that she questioned Guyton in the grand jury on March 30, 2009. (Tr. C12) According to McCoy-Cummings, Guyton testified that he saw Petitioner raise the gun and start shooting. (Tr. C12) On cross examination, McCoy-Cummings testified that Guyton did not tell her a fight occurred before the shooting, nor did he tell her that Lamarius had possession of the gun before Petitioner. (Tr. C17-C18)

The State also presented the testimony of Chicago Police Officer Wayne Frano. Frano testified that he was on routine patrol on December 3, 2008, at 9:10 p.m., in the area of Augusta Avenue and Lavergne Avenue, when he heard shots fired. (Tr. B87-B88) According to Frano, when he and his partner approached the light at Iowa, three black males ran toward their car. (Tr. B89) Frano testified that he recognized one of the individuals to be Petitioner, but he did not recognize the other two. (Tr.

7

Robinson 002611

B89) One of the men, slowed down and told Frano that a shooting had occurred and he pointed toward Lawler and Iowa. (Tr. B91)

Frano testified that it took him and his partner only three seconds to get the site of the shooting after hearing the shots. (Tr. B97) On cross examination, Frano admitted that when they arrived on the corner, he saw no other individuals besides the three that ran. (Tr. B98) Frano also admitted on cross examination that he never told any detectives about having seen Petitioner on the night of the shooting until March 4, 2009. (Tr. B103) Nor did he write any reports about what he witnessed. (Tr. B103)

Chicago Police Forensic Investigator Carl Brasic testified that photographed the scene of the shooting on December 3, 2008. (Tr. C30) He also collected any physical evidence he could find. (Tr. C32)

Illinois State Police Forensic Officer Marc Pomerance testified that he examined the casings recovered from the scene, and determined that they were all fired from the same gun. (Tr. C70) According to Pomerance, the cartridges were for a .45 caliber weapon. (Tr. C64-C65) Pomerance testified that he could not determine if the casings and bullets came from the same gun, however, because he would need the actual gun to do a control test. (Tr. C76)

Chicago Police Detective Timothy McDermott testified that he was assigned to investigate the shooting of Hanford. (Tr. C85) McDermott testified that he went to the scene and began organizing a canvas for witnesses. (Tr. C88) After being on the scene, he returned to his office and submitted a "buy-bust" request in hopes of

8

Robinson 002612

producing a witness with information. (Tr. C91) McDermott testified that a "buy-bust" is an investigative tool used to develop leads or witnesses. (Tr. C91)[1]

According to McDermott, he was notified that Guyton was at the station to provide information, but McDermott spoke with Russell first. (Tr. C92-C93) Russell was locked in an interview room when McDermott spoke with him. (Tr. C 95) After speaking with Russell, McDermott testified that he created a photo array, and Russell identified Petitioner from the array. (Tr. C99) According to McDermott, Russell identified Petitioner as the person he sold drugs for. (Tr. C100) McDermott also testified that Russell identified Petitioner as the person who shot and killed Hanford. (Tr. C100) Russell also identified Lamarius as an associate of Petitioner's. (Tr. C101)

McDermott testified that he next spoke with Guyton. (Tr. C102) After speaking with Guyton, McDermott assembled another photo array and showed it to Guyton. (Tr. C103) According to McDermott, Guyton refused to sign the photo array advisory form, claiming that he did not want his name associated with a murder. (Tr. C104) Guyton did identify Petitioner in the array as someone he knew from the streets. (Tr. C106) According to McDermott, despite Russell's identification of Petitioner as the shooter, he did not arrest Petitioner because he had no corroboration of Russell's claims. (Tr. C108) Apparently no evidence was cultivated

---

[1] In case law, a "buy-bust" is described as an undercover police officer or informant buying drugs from a target, and the police arrest the target and use the pending charges to obtain information on an unrelated matter. *See generally*, *People v. Hayes*, 144 Ill.App.3d 696, 494 N.E.2d 1238 (2nd Dist. 1986).

Robinson 002613

in the next three months, and Petitioner was never brought in for questioning.

Three months later, on March 2, 2009, McDermott testified that he was informed that Guyton was in custody, and willing to talk. (Tr. C109) This time Guyton was, as McDermott testified, "more forthcoming." (Tr. C110) According to McDermott, Guyton signed the photo array advisory form and identified Petitioner as the shooter. (Tr. C113) McDermott testified that he then brought Russell in for further questioning, and had both men interviewed by the State's Attorney's Office Felony Review Unit. (Tr. C115-C116)

After giving their statements to the ASAs, McDermott went to Petitioner's home and placed Petitioner under arrest. (Tr. C117) According to McDermott, Petitioner fled out the back door on foot, but was caught immediately. (Tr. C117) McDermott testified that Lamarius was also taken to the station to be interviewed. (Tr. C118)

On cross examination, McDermott admitted that both Russell and Guyton identified Petitioner on December 4, 2008, and he knew where Petitioner was living, yet he never went to question Petitioner before his arrest on March 3, 2009. (Tr. C125-C126) Indeed, McDermott admitted that no additional evidence was cultivated in the three intervening months. (Tr. C127) McDermott also acknowledged that the first time he spoke to Frano about Frano's purported observations the night of the shooting was on March 4, 2009, when Frano viewed Petitioner in a line-up. McDermott acknowledged that he had seen Frano on occasion at the station, but they had not discussed this case. (Tr. C137) McDermott also admitted that Guyton was in

10

**Robinson 002614**

custody on March 2, 2009, as a result of a buy-bust. (Tr. C143)

The state also called the forensic pathologist, Dr. James Filkins, who conducted the autopsy of Hanford. (Tr. C171) Filkins testified that Hanford was shot four times, and the cause of death was multiple gun shot wounds. (Tr. C190)

Lastly, the state indicated that it now wished to call Lamarius Robinson as a witness in its case, but since he remained a suspect in the case, the state indicated he had a Fifth Amendment right which he should be advised of before testifying. (Tr. C151) The court concluded that since he could be charged on an accountability basis, Lamarius was entitled to consult with the Public Defender before testifying. (Tr. C152)

After a short recess, the Public Defender advised the court that Lamarius would invoke his Fifth Amendment right not to testify. (Tr. C154) The state informed the court that they had spoken with Lamarius about a letter that he had allegedly written to Petitioner wherein he admitted to having committed the offense. (Tr. C155) Lamarius denied to the state having written the letter or having any knowledge of it, though he indicated that he may have addressed the envelope. (Tr. C155) Furthermore, Lamarius told the state that he only told the police what they made him say, and that he was not present at the shooting. (Tr. C155)

Defense counsel informed the court that Lamarius told him the same thing. (Tr. C155) According defense counsel, Lamarius claimed only to have heard about the shooting on the street, and that he "hemmed and hawed" about the letter but ultimately denied writing it. (Tr. C155)

11

Robinson 002615

Lamarius was then called to the stand outside of the presence of the jury. (Tr. C156) Lamarius denied being at the scene of the shooting on December 3, 2008. (Tr. C157) He also denied telling the police that he witnessed the shooting. (Tr. C158) Lamarius then invoked the Fifth Amendment and refused to answer any further questions. (Tr. C158)

The state argued that Lamarius's denial that he was at the scene and denial that he wrote the letter to Petitioner negated his Fifth Amendment privilege such that he should not be precluded from testifying. (Tr. C159) The court ruled that because the state said pretrial that he was the subject of a continuing investigation, he was permitted to invoke his Fifth Amendment right not to testify. (Tr. C162) The letter allegedly written by Lamarius to Petitioner was not entered into evidence by defense counsel, and was, therefore, not available for review on direct appeal.

Defense counsel requested that he at least be allowed to testify that he was not at the scene in order to impeach Guyton and Russell's claims to the contrary. (Tr. C163-C164) The court refused to allow Lamarius to answer some questions and not others before the jury. (Tr. C165)

After the conclusion of the testimony, the state rested. (Tr. C195) A motion for directed finding was denied. (Tr. C200) The court advised Petitioner of his right to testify, and Petitioner declined to testify. (Tr. C201) The defense rested without the presentation of any evidence. (Tr. C202)

In its closing argument, the state argued that Petitioner was guilty, and that the jury never heard any testimony that anyone else was the shooter. (Tr. D11) In its

Robinson 002616

closing, the defense emphasized the differences between Guyton and Russell's version of the shooting. (Tr. D34-D35)

The jury subsequently convicted Petitioner of murder, and the enhanced sentencing provision for having personally discharged the firearm. (Tr. D84)

### III. Petitioner Was Denied Effective Assistance of Counsel at Trial in Violation of the Sixth Amendment to the United States Constitution and Article One, Section Eight of the Illinois Constitution.

It is a well settled principle of law that a criminal defendant has a constitutional right to the effective assistance of counsel at trial. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984); *People v. Dillard*, 204 Ill.App.3d 7, 561 N.E.2d 1219 (3rd Dist. 1990); *People v. Makiel*, 358 Ill.App.3d 102, 830 N.E.2d 731 (1st Dist. 2005). To establish a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient, and that he was prejudiced by the deficient performance. *Dillard*, 561 N.E.2d at 1220-21; *Makiel*, 830 N.E.2d at 737.

Through a multitude of failures, it is clear in this case that Petitioner was not afforded the effective assistance of counsel guaranteed to him by the Sixth Amendment of the Constitution. Indeed, a review of the record, coupled with the evidence that counsel failed to present, makes clear that Petitioner is actually innocent of this crime, and had a more than reasonable likelihood of success at trial had his counsel not been prejudicially deficient.

13

Robinson 002617

A.   Trial counsel was ineffective for failing to investigate and present evidence that would have refuted the State's evidence, established that Petitioner's cousin was the actual shooter, and shown that Petitioner was not even present at the scene of the shooting.

Trial counsel failed to present testimony from the following individuals: Jenee Moreland, Quinton Martell Davis, Latanya Fleming, Ethel Lewis, Johntay Washington, Ozell Jackson, and Aaron Marshall. These witnesses would have provided evidence that Petitioner had an alibi for the time of the shooting, and that Lamarius Robinson admitted to having been the shooter. These witnesses would also have impeached the credibility of Oscar Russell and Deandre Guyton. Trial counsel's failure to interview and then present the testimony of these witnesses was indefensible and extremely prejudicial to Petitioner's defense.

Perhaps the most well recognized example of ineffective assistance of trial counsel is the failure to investigate potentially exculpatory evidence. *See, Dillard*, 561 N.E.2d at 1220-21; *Makiel*, 830 N.E.2d at 739. Indeed, defense counsel have a professional obligation to explore and investigate a client's case. *Id.* And, while decisions to call witnesses generally fall within the ambit of trial strategy, counsel may be ineffective for failing to present exculpatory evidence of which he is aware, and which would support an otherwise uncorroborated defense. *People v. Skinner*, 220 Ill.App.3d 479, 485-86, 581 N.E.2d 252 (1st Dist. 1991). Matters of trial strategy will not be upheld where the strategy is unsound. *See, People v. Thompkins*, 191 Ill.2d 438, 470, 732 N.E.2d 553 (2000) (counsel ineffective for failing to present mitigating evidence at sentencing where no sound reason not to present such

14

Robinson 002618

evidence existed).

In this case, trial counsel's failure to investigate and present testimony from the aforementioned witnesses was objectively unreasonable in light of the nature of the potential testimony. As Petitioner makes clear in his affidavit, attached hereto as Exhibit A, he requested that his trial counsel interview all of the witnesses set forth below and present their testimony on his behalf. Yet, counsel failed to even interview any of the individuals to ascertain the importance of their testimony, let alone call them at Petitioner's trial.

> 1. **Jenee Moreland an Quinton Davis would have testified that Lamarius Robinson confessed to killing Hanford immediately after the shooting.**

Attached hereto as Exhibit B is the affidavit of Jenee Moreland. In her affidavit, Ms. Moreland describes an interaction she had with Lamarius Robinson on December 3, 2008, shortly after the shooting of Hanford. Ms. Moreland states that she received a call from Lamarius at approximately 9:15 p.m. that night, and he requested that she pick him up. According to Ms. Moreland, she picked Lamarius up at the intersection of Chicago and Cicero Avenues, in Chicago. Ms. Moreland attests that Lamarius was acting very nervously and declared that he had just killed someone. According to Ms. Moreland, she became very upset by Lamarius's admission and told him to get out of her car. She then dropped him off at a gas station at Cicero and Madison Avenues. Ms. Moreland affirms that she would have testified to these facts at Petitioner's trial, but she was never contacted by anyone representing Petitioner for an interview or to request her testimony.

15

Robinson 002619

Attached hereto as Exhibit C is an affidavit of Quinton Martell Davis. Mr. Davis states that he received a call from Lamarius Robinson on the night of December 3, 2008, after 9:15 p.m., requesting that Mr. Davis pick him up at a gas station at Madison and Cicero Avenues. Mr. Davis and his girlfriend then picked Lamarius up, and drove toward Mr. Davis's grandmother's house at 1517 South Central Park Avenue, in Chicago.

While on the way to Mr. Davis's grandmother's house, Lamarius told Mr. Davis that he had just shot "13". *See*, Ex. C. Lamarius told Mr. Davis that he was on Lawler when he saw "13" coming out of a house. *Id.* Lamarius told Mr. Davis that he ran up on "13" and shot him several times. *Id.* According to Mr. Davis's affidavit, Lamarius showed him a shiny chrome and black .45 handgun, which Lamarius said was the gun he had used to kill "13". *Id.* Lamarius admitted that he first called Jenee Moreland to pick him up, and then called Mr. Davis. *Id.*

Mr. Davis's affidavit also makes clear that Petitioner was not present when Lamarius killed Hanford. Rather, once at Mr. Davis's grandmother house, Mr. Davis called Petitioner to come over to the house. Mr. Davis was then present when Lamarius told Petitioner what he had done. *Id.*

Mr. Davis further attests that he spent the next few months with Lamarius, and that Lamarius had a very difficult time dealing with the fact that he had killed someone. In order to cope with the guilt, Lamarius began using more drugs. *Id.*

Mr. Davis also received a letter from Lamarius, different from the one defense counsel presented during trial, wherein Lamarius expressed his desire to

16

**Robinson 002620**

make things right for Petitioner being convicted of the murder of Hanford. A copy of the letter is attached to Mr. Davis's affidavit. Mr. Davis further attests that he would have provided all of this testimony at Petitioner's trial, but he was never interviewed by anyone representing Petitioner. *Id.*

The failure to present generally exculpatory evidence can amount to ineffective assistance of counsel. *Skinner*, 220 Ill.App.3d at 485-86. Specifically, evidence that a third party confessed to the offense on more than one occasion to multiple people is the most obvious example of exculpatory evidence, and the failure to present, or even explore it, establishes clear and prejudicial ineffectiveness. Moreover, this evidence cannot be shrugged off as inadmissible hearsay, such that counsel was excused from presenting it.

In *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038 (1979), as well as *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150 (1979), the United States Supreme Court established the principle that due process requires that the states "must allow defendants to put reliable third-party confessions before the jury, despite the hearsay rule, when necessary to assist in separating the guilty from the innocent." *Carson v. Peters*, 43 F.3d 384, 385 (7th Cir. 1994). The Illinois Supreme Court has embraced this principle and reversed convictions where such evidence was not admitted. *People v. Tenney*, 205 Ill.2d 411, 793 N.E.2d 571 (2002); *People v. Cruz*, 162 Ill.2d 314, 643 N.E.2d 636 (1994).

*Chambers* and its progeny have set forth a four factor guideline for determining the admissibility of third party confessions. The factors include: (1) the

17

**Robinson 002621**

statement was spontaneously made to a close acquaintance shortly after the crime; (2) the statement is corroborated by some other evidence; (3) the statement is self-incriminating and against the declarant's interest; and, (4) there was adequate opportunity for cross examination of the declarant. *Tenney*, 205 Ill.2d at 435. These four factors are merely guidelines and not requirements; not all four need be present for the proffered statements to be admissible. *Id.* Indeed, in *Tenney*, only the first three factors were present, yet the Illinois Supreme Court found sufficient reliability for the admission of the statements.

Here, as in *Tenney*, the statements of Lamarius to both Ms. Moreland and Mr. Davis meet the first three of the *Chambers* factors. Ms. Moreland is a close enough friend to Lamarius that he called her for a ride after 9:00 p.m. Likewise, Mr. Davis is a friend of Lamarius's for approximately twenty years, and someone with whom he would visit at his grandmother's home. There can be no question that Ms. Moreland and Mr. Davis are close acquaintances of Lamarius.

Likewise, Lamarius made the inculpatory statements to them within a very short time after the shooting. The statement to Ms. Moreland was literally made right after the offense, and the statement to Mr. Davis followed shortly thereafter.

The statements to these individuals are corroborated by each other as well as other evidence in the case. As this Court is aware, there was a letter which the defense claimed was authored by Lamarius wherein he admitted to the killing of Hanford. While that letter was ultimately not presented to the jury, it is corroboration of Lamarius's spontaneous statements on the night of the shooting.

18

**Robinson 002622**

In addition, in his statement to Mr. Davis, Lamarius displayed the handgun he used which fit the ballistics evidence presented at trial. And, the letter Lamarius later sent to Mr. Davis expressed his remorse for putting Petitioner in the position to be convicted of this offense.

With respect to the third factor, the statement is obviously self-incriminating and against Lamarius's interest. Indeed, when he was called by the state at Petitioner's trial, he invoked the Fifth Amendment and elected not to testify.

Due to that invocation, Lamarius is presumably able to prevent the state from cross examining him, but as in *Tenney*, the absence of this factor is not dispositive of the issue. The statements made to Ms. Moreland and Mr. Davis would have been properly admitted had defense counsel interviewed them as requested by Petitioner, and procured their testimony.

There can be no sound strategic reason to fail to at least interview these witnesses. They were available and willing to testify, and their testimony was highly relevant. The absence of their testimony was also extremely prejudicial to Petitioner's defense. In closing, the state argued to the jury that they never heard any testimony that anyone else was the shooter. (Tr. D11) Had this evidence been presented, such an argument would have been improper.

This evidence would have also provided Petitioner with an actual defense. As it was, trial counsel presented no evidence or testimony. Instead, he relied on the argument that Russell was lying, and that Russell and Guyton gave inconsistent versions of the events. Failing to interview and call these witnesses hamstrung the

19

**Robinson 002623**

defense into arguing that while Petitioner was present at the shooting, he was not the shooter.

Furthermore, the testimony of Mr. Davis and Ms. Moreland would have opened up a whole new line of defense that Petitioner was not present for the shooting. Coupled with the evidence that will be discussed later herein, there can be no excuse for counsel's failure to present this highly relevant and exculpatory testimony. An evidentiary hearing is necessary at which Petitioner can present evidence from the witnesses identified herein.

    **2.    Latanya Fleming, Ethel Lewis and Quinton Davis would have provided Petitioner with an alibi.**

On the day of the shooting, Petitioner had taken his mother, Latanya Fleming, to work on December 3, 2008, at 2:30 p.m., and was supposed to pick her up when her shift ended at 9:00 p.m. *See*, Affidavit of Latanya Fleming attached hereto as Exhibit D; and Ex. A. Ms. Fleming was working at the Dominick's grocery store then located at Halsted Street and Madison Avenue, in Chicago. Petitioner went into the store at 9:00 p.m. to pick up his mother, at which time she told him she had just been asked to work until 10:30 p.m. *See*, Exs. A & D. Records of Ms. Fleming's employment on that day are attached to her affidavit. The records confirm that her shift was scheduled to end at 9:00 p.m., but that she ultimately worked until 10:30 p.m. Because his mother was not ready to leave, Petitioner purchased a candy bar and then waited in the car in the parking lot for his mother to finish. *See*, Exs. A & D.

20

Robinson 002624

While in the store, Ms. Fleming introduced Petitioner to her co-worker Ethel Lewis. Attached hereto as Exhibit E is the affidavit of Ms. Lewis. Ms. Lewis confirms in her affidavit that she had seen Petitioner in the store on prior occasions picking up Ms. Fleming. And, while she does not remember the exact date that she was formally introduced to Petitioner, it was a winter day later in the evening, possibly around 9:00 p.m. Furthermore, the day stands out in Ms. Lewis's mind because Petitioner came to pick Ms. Fleming up and then Ms. Fleming had to work longer, which was an uncommon occurrence. In addition, Ms. Lewis recalls that instance as being the last time she saw Petitioner in the store, and a few months later learning of his arrest from Ms. Fleming. Ms. Lewis affirms that she would have testified to these facts at Petitioner's trial had anyone approached her to do so.

In addition, as discussed previously, Quinton Davis could also have confirmed Petitioner's whereabouts at the time of the shooting. Mr. Davis attested that he was aware that Petitioner was picking his mother up from work at the time of the shooting. *See*, Ex. C.

The testimony of Petitioner's mother providing him with an alibi may not, by itself, be definitive evidence of Petitioner's whereabouts at the time of the shooting of Hanford. However, when Ms. Fleming's testimony is coupled with the testimony of Ms. Lewis, who remembers the circumstances of her introduction to Petitioner as it relates to him having to wait for his mother to finish an extended shift, it becomes highly compelling evidence.

The evidence at trial established that the shooting took place at 9:10 p.m., on

21

Robinson 002625

December 3, 2008. It would have been impossible for Petitioner to have learned at 9:00 p.m. when he was in the store that his mother would be working late, and then make it to the area of Iowa and Lawler in time to commit the offense.[2]

But the jury did not hear any of this evidence despite Petitioner advising his trial counsel to speak with his mother to establish his whereabouts at the time of the shooting. Had the jury heard that Petitioner was picking up his mother from work, supported by records and with corroboration from a disinterested witness, the testimony of Russell and Guyton would have been viewed with a great deal of skepticism, and deservedly so. Moreover, had trial counsel conducted the interview of Ms. Lewis closer in time to the events of the shooting, she may well have been able to recall the date specifically rather than merely remembering it based on the circumstances of Ms. Fleming's work schedule. Trial counsel never interviewed or presented the testimony of Ms. Lewis and did not call Ms. Fleming to testify either. Thus, the jury was left with only the testimony of the state's witnesses who placed Petitioner at the scene of the shooting.

In *Raygoza v. Hulick*, 474 F.3d 958 (7th Cir. 2007), the Seventh Circuit found that trial counsel's failure to call alibi witnesses prejudiced the defendant where "[t]he only evidence apart from the suppressed confession linking [defendant] to the

---

[2] Google Maps calculates the time to travel between these two points as being between 17 and 25 minutes depending on traffic. *See,* https://www.google.com/maps/dir/Madison+%26+Halsted/W+Iowa+St+%26+N+Lawler+Ave,+Chicago,+IL/@41.8853861,-87.7332472,13z/data=!3m1!4b1!4m13!4m12!1m5!1m1!1s0x880e2cc4b835e74d:0xd320e0fd8d8fff36!2m2!1d-87.647558!2d41.881853!1m5!1m1!1s0x880e3334a14a57ed:0x79f9cb7cd196e0c7!2m2!1d-87.7519676!2d41.8967788.

Robinson 002626

crime was eyewitness identification." *Id.*, at 965. There, counsel's decision to not call all of the available alibi witnesses was made after interviewing the witnesses and determining that each would be independently vulnerable during cross examination. *Id.*, at 962-964. Further, counsel in *Raygoza* did call defendant's girlfriend as an alibi witness to corroborate defendant's own testimony. Despite the fact that Raygoza's counsel made an informed decision to not call all the available alibi witnesses, the court found that this strategic decision constituted ineffective assistance of counsel. In reaching this conclusion, this Court stated:

> [A] trier of fact approaching the case with fresh eyes might choose to believe the eyewitnesses and to reject the alibi evidence, but this trier of fact never had the chance to do so. This undermines our confidence in the outcome of the proceedings so seriously that we conclude that there is a reasonable probability that the result would have been different had Raygoza's attorney presented the testimony of all or most of his alibi witnesses.

*Id.*, at 965.

The facts of this case are more egregious than those of *Raygoza*. Here, counsel did not interview the potential alibi witnesses. Thus, it cannot even be said that a strategic decision was made not to call them. The failure to present an alibi becomes more egregious when considered with the fact that defense counsel was aware that another person had claimed responsibility for the offense. In light of that information, the failure to conduct an investigation of alibi witnesses is even more egregious. An evidentiary hearing is necessary at which Petitioner can present evidence from the witnesses identified herein, after which Petitioner is entitled to a new trial with representation by effective counsel.

23

Robinson 002627

### 3. Johntay Washington, Ozell Jackson, and Aaron Marshall would have impeached the testimony of Oscar Russell.

During Oscar Russell's interview by police, his handwritten statement, and again in his grand jury testimony, Russell claimed that other individuals were on the street with him when he witnessed the shooting of Hanford. Russell identified these individuals as "Tay", "Ozell", "Big Shorty" and "Feb". According to his handwritten statement, he also identified mug shots of these individuals.

Petitioner informed his trial counsel that these supposed witnesses where Johntay Washington ("Tay"), Ozell Jackson ("Ozell"), Jamion Winters ("Big Shorty"), and February Burage ("Feb"). *See*, Ex. A. These individuals were also named in the police report interview of Russell, and a General Progress Report generated by the police. Petitioner further informed his trial counsel that these individuals would be willing to testify at Petitioner's trial that they were not present for the shooting of Hanford. Nonetheless, none of these men were called to testify at Petitioner's trial, nor did defense counsel speak with them.

Russell's handwritten statement also reflects that the source of animosity between Hanford and Petitioner was due to an argument that arose between Hanford's chief, "10-4", during which Hanford called Petitioner a "bitch." Russell reiterated this claim before the grand jury when he testified that a couple of weeks before the death of Hanford, Petitioner and Hanford's chief had an argument over drug turf. Petitioner advised his counsel to speak with Aaron Marshall, a.k.a. "10-4", who would affirm that no such fight ever occurred. Again, trial counsel failed to

24

Robinson 002628

interview or speak with Mr. Marshall about his potential testimony on Petitioner's behalf.

Attached hereto as Exhibit F is the affidavit of Johntay Washington. Mr. Washington affirms that he was not present at the time Hanford was shot. Indeed, he admits that he was taken into custody a week or two after the shooting and interrogated by the police about Russell's claims that he had witnessed the shooting. Mr. Washington informed the police at that time that he was not present and had no information about the shooting of Hanford. Mr. Washington attests that anyone who claimed he was present was not telling the truth. Furthermore, Mr. Washington attests that no attorney or investigator working for Petitioner ever contacted him about testifying at Petitioner's trial, but that had he been contacted, he would have testified as set forth in the affidavit.

Similarly, attached hereto as Exhibit G is the affidavit of Ozell Jackson.[3] Mr. Jackson makes clear in his affidavit that not only was he not present on the street when Hanford was shot, he was actually incarcerated in the Juvenile Temporary Detention Center ("Audy Home") at the time. It was not until after Christmas 2008, when he had been released from the Audy Home, that he learned of the death of Hanford. Then, according to Mr. Jackson, he heard from Oscar Russell himself, as well as from many others, that the person who killed Hanford was Petitioner's

---

[3] Counsel spoke with Mr. Jackson on June 16, 2014, and sent him the attached affidavit the same day based on that conversation. Mr. Jackson, who is incarcerated at Western Illinois Correctional Center in Mt. Sterling, Illinois, informed counsel he would execute the affidavit and return it as soon as possible. Counsel will supplement this petition with the executed affidavit once it is received.

Robinson 002629

cousin, Lamarius Robinson. Mr. Jackson attests that he was never contacted by any attorney or investigator on Petitioner's behalf, but that had he been, he would have testified that he did not witness the shooting and anyone claiming otherwise was lying.

Finally, attached hereto as Exhibit H is the affidavit of Aaron Marshall, a.k.a. "10-4". As Mr. Marshall's affidavit makes clear, two weeks prior to the death of Hanford, he was taken into custody and stayed at the Cook County Jail until June 12, 2009. Mr. Marshall affirms that he was not present for any argument between himself, Hanford and Petitioner, nor did any such argument occur. Indeed, Mr. Marshall makes clear that he has never had anything but an amicable relationship with Petitioner. Mr. Marshall also attests that he discussed his willingness to testify on Petitioner's behalf at trial, but he was never contacted by anyone representing Petitioner.

It is clear that the testimony of these three men would have greatly undermined the credibility of Russell. In this case, Russell's testimony was virtually unchallenged other than the suggestion that he was treated poorly by the police when he was brought in for questioning. Evidence that two of the people he claimed also witnessed the shooting were not present, and one was even in custody, would have eviscerated his credibility in the eyes of the jury.[4] This is also true of

---

[4] Counsel spoke with February Burage, who is incarcerated at the Dixon Correctional Center, on June 23 2014. Mr. Burage informed counsel that he would like to speak with his own attorney, and would then have his attorney contact undersigned counsel. With respect to Jamion Winters, counsel has thus far been unable to locate him, but efforts continue.

26

Robinson 002630

the testimony of Mr. Marshall. Russell's whole claim as to why Petitioner would have any motive for shooting Hanford is completely discredited by Mr. Marshall's testimony.

In *Malone v. Walls*, 538 F.3d 744 (7th Cir. 2008), the Seventh Circuit noted that eyewitness testimony was the crux of the state's case, and all of the eyewitnesses had vulnerabilities in identifying the defendant's alleged role in the offense. *Id.*, at 760. Thus, the state appellate court's conclusion that trial counsel was not ineffective for failing to present certain exculpatory witness was unreasonable. Such a conclusion, could only be reached by turning a "blind eye" to the nature of the evidence against the defendant and the significance of the witnesses's exculpatory testimony. *Id.*

Likewise, in *Stanley v. Bartley*, 465 F.3d 810 (7th Cir. 2006), the Seventh Circuit noted that the failure to interview any witnesses or prospective witnesses was "a shocking dereliction of professional duty in a case in which the state's evidence... was far from compelling." *Id.*, at 813. There, the court noted that just because counsel had a police report summarizing a witness's statement, the attorney could not know how complete or accurate that statement was without interviewing the witness himself. *Id.*

There is no legitimate excuse for trial counsel's failure to speak with or call these witnesses in Petitioner's case. An evidentiary hearing is necessary at which Petitioner can present evidence from the witnesses identified herein.

27

Robinson 002631

**B.** **Trial counsel was ineffective for failing to demonstrate the authenticity of the letter written by Lamarius Robinson wherein Lamarius admitted to having committed the shooting.**

Just before jury selection in this case, defense counsel announced his intention to call Lamarius Robinson to testify, and to introduce a letter counsel alleged was written by Lamarius wherein he admitted that he shot Hanford and Petitioner did not. A copy of the letter, which was never made part of the trial record, is attached hereto as Exhibit I. When the letter was first raised as an issue, the court questioned whether the "only way to be able to prove up that he [Lamarius], in fact, was the author of the letter was for him to testify. Am I correct?" (Tr. A18) Ultimately, the court tabled the issue to be discussed again once it was known whether or not Lamarius would testify or plead the Fifth Amendment.

Two days after the court's initial comment about the admissibility of the letter, the state announced its intention to call Lamarius to testify in the state's case in chief. Prior to the state calling him, Lamarius was allowed to speak with a Public Defender, and elected to invoke the Fifth Amendment. The State proffered that they had spoken with Lamarius, and he denied writing the letter. (Tr. C155) Defense counsel also proffered that he spoke with Lamarius, and Lamarius "hemmed and hawed a bit" but ultimately denied writing the letter. (Tr. C155)

Lamarius then took the witness stand outside the presence of the jury. He denied being present for the shooting of Hanford, and denied writing the letter to Petitioner admitting to killing Hanford. (Tr. C159) Lamarius did admit, however,

28

Robinson 002632

that it was probably his writing on the envelope in which the letter came. (Tr. C160)

The court then excused Lamarius and ruled that he had a Fifth Amendment right, and he would not be allowed to testify before the jury. (Tr. C163) The court asked defense counsel if he had any argument with respect to the letter. (Tr. C163) Defense counsel made no argument about getting the letter into evidence. The court indicated that it would give defense counsel another opportunity to make any argument about the letter's admissibility during the defense case in chief. (Tr. C166) When later asked by the court after the state rested if Lamarius was needed for anything further, defense counsel said, "Based on the court's ruling no." (Tr. C196)[5]

Had counsel conducted a modicum of research in the two days since the court's comments regarding the letter's admissibility, or prior to that, counsel would have realized that Lamarius's testimony was not necessary in order to authenticate the letter. In order to authenticate handwriting, the proponent of the evidence need only "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed.R.Evid. Rule 901(a).[6] As such, several ways exists to

---

[5] While it is unclear to what ruling defense counsel was referring, it would appear that it was to the court's ruling that Lamarius had a Fifth Amendment right not to testify. The court's questions as to the admissibility of the letter were left open for defense counsel to argue or present case law, neither of which he did.

[6] Effective January 1, 2011, Illinois adopted certain Federal Rules of Evidence as the new Illinois Rules of Evidence. Rule 901 is one such rule, which was effective at the time of Petitioner's trial.

29

Robinson 002633

make this showing: (1) testimony that a matter is what it is claimed to be; (2) a nonexpert opinion as to genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation; (3) a comparison by the trier of fact or by expert witnesses with specimens which have been; or, (4) the appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances. Ill.R.Evid. Rule 901(b)(1)-(4); *Board of Education of DuPage High School Dist. 88 v. Pollastrini*, 2013 IL App (2d) 120460, ¶87 (Birkett, J., specially concurring); *People v. Williams*, 274 Ill.App.3d 598, 608, 653 N.E.2d 899 (1st Dist. 1995); *People v. Faircloth*, 234 Ill.App.3d 386, 392, 599 N.E.2d 1356 (3rd Dist. 1992). Indeed, proof of handwriting is not necessary to authenticate a private letter; it can be made by circumstantial evidence. *Faircloth*, 234 Ill.App.3d at 392.

In *Faircloth*, the state introduced letters purportedly written by the defendant, and the appellate court found the circumstantial evidence that the defendant was the author to be overwhelming. That evidence included: the return address coming from the jail the defendant was housed; they were written in response to letters sent by the person to whom they were addressed; they were signed with the defendant's name; the letters discussed subjects only the defendant knew about including details of the night the victim died; and, the defendant discussed the contents of the letters with the addressee on the telephone. *Id.*

In *Williams*, the state introduced a map into evidence that had been mailed to the witness from the defendant. She testified that she was familiar with the

30

**Robinson 002634**

defendant's handwriting, and that the handwriting on the map was his. *Williams*, 274 Ill.App.3d at 608. The appellate court agreed that this testimony was sufficient to authenticate and identify the defendant's handwriting on the map. *Id.*

In *United States v. Spano*, 421 F.3d 599 (7th Cir. 2005), the Seventh Circuit was faced with the argument that the defendant's signature on checks were forgeries. A known sample of the defendant's signature was also introduced, but no handwriting expert or person familiar with the defendant's handwriting was called to testify. *Id.*, at 604. According to the Seventh Circuit, a jury is competent to determine the genuineness of a signature by comparing it to signature known to be genuine. *Id.*, at 605.

It is clear that had defense counsel conducted any research whatsoever, he would have discovered many other ways in which to authenticate the letter written by Lamarius. Indeed, had he interviewed Quinton Davis, a long time friend and close acquaintance of Lamarius's, he could have identified the handwriting as Lamarius's as he says in his affidavit. *See*, Ex. C. In addition, in that Lamarius admitted that he probably wrote the envelope that the letter came in, this is further circumstantial evidence of its authenticity. Or, as in *Spano*, defense counsel could have requested the court to compel Lamarius to submit a handwriting sample,[7] which the jury could have then compared to the letter purportedly written by him. Or, counsel could have used other letters also written by Lamarius, such as the one

---

[7] No Fifth Amendment privilege is infringed from the taking of a handwriting sample. *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951 (1967).

31

Robinson 002635

attached hereto as Exhibit J, where internal consistencies in the handwriting can be seen. For example, Lamarius apparently favors writing his lowercase "f" backwards, writing "fill" when he means "feel", or writing "um" when he means "I'm".

Authentication of the letter was actually a fairly easy proposition had defense counsel made any effort whatsoever to gain its admission. The testimony of Lamarius was not the only way to authenticate the letter. Counsel's failure to explore other avenues for its admission once the court suggested on the first day of trial that Lamarius had to testify to get the letter in was a complete dereliction of counsel's duties to present a defense.

Indeed, it is clear that counsel had no other defense prepared, and was apparently relying solely on his ability to get Lamarius to admit to having written the letter. Being on notice on the first day of trial that Lamarius may not testify, or may not claim authorship of the letter, there is simply no excuse for why two days later counsel had no other arguments for how the letter was admissible in the absence of Lamarius's testimony.[8] This is particularly when the arguments were so readily attainable, and the court had invited counsel to weigh in further on the matter and present arguments on the letter's admissibility.

Once authenticated, defense counsel also had to establish that the letter was not hearsay. As discussed Section III.A.1, *supra*, the letter would fit the guidelines

---

[8] Counsel should also have considered, pretrial, that Lamarius might decline to testify or might disavow the letter because the letter confessed to a murder.

**Robinson 002636**

of *Chambers*, thus supporting its admissibility. The letter was dated January 21, 2010, a little over a year after the offense. It was corroborated by other evidence in the case that was or could have been presented, including the statements of Lamarius immediately after the shooting that he had killed Hanford and eyewitness testimony that Lamarius pointed a gun at a third party in the same area shortly before the shooting of Hanford.

The letter was also very clearly a statement against interest. A direct quote from the letter is "what um sayn is I did it you wasn't even there I could do the time cuz its minds anyway". The letter later says "I licked the page at the bottom so ma DNA could be on here even if you have 2 use this". Then there is a circled area at the bottom of the page where the letter was apparently licked. *See*, Ex. I.

As discussed previously, *Chambers* makes clear that due process requires that the states "must allow defendants to put reliable third-party confessions before the jury, despite the hearsay rule, when necessary to assist in separating the guilty from the innocent." *Carson v. Peters*, 43 F.3d 384, 385 (7th Cir. 1994). Here, counsel's failure to obtain the admission of the letter into evidence has resulted in the conviction of an innocent man. Furthermore, without this evidence, the state was able to argue that there was no evidence that anyone else was the shooter.

Petitioner is entitled to a new trial where he can present evidence that Lamarius confessed to killing Hanford in the letter Lamarius sent to Petitioner.

**Robinson 002637**

### C.    Trial counsel was ineffective for failing to object to the introduction into evidence of prior consistent statements of Guyton.

During the direct examination of Deandre Guyton, the state asked him numerous questions about the substance of his grand jury testimony. While some of the prior testimony involved matters which Guyton denied making at trial, many of the questions were simply prior consistent statements. Despite the inadmissibility of these prior consistent statements, trial counsel voiced no objection to their admission into evidence.

"A witness may not be corroborated on direct examination by proof of prior statements consistent with his testimony." *People v. Williams*, 147 Ill.2d 173, 227, 588 N.E.2d 983 (1991). Likewise, use of a prior inconsistent statement to impeach a witness does not render admissible portions of the prior statement that are not inconsistent. In other words, the prior consistent portions of the statement remain inadmissible. *Id.*

Here, during Guyton's direct examination, he tried to qualify his grand jury testimony about whether or not he saw Petitioner shoot Hanford. Guyton did not, however, dispute many of the things he stated in the grand jury. The state at trial, however, repeated those consistent statements nonetheless.

For example, Guyton testified at trial that he saw fire come from the gun and Hanford get shot. (Tr. B120) Despite this unequivocal testimony, the state proceeded to introduce his grand jury testimony where in he testified that he saw fire coming from the gun and the bullets hit Hanford. (Tr. B137) Likewise, Guyton

34

Robinson 002638

testified at trial that he made a statement to the police and the ASA at the police station, that he was treated fine and that no threats or promises were made to him. (Tr. B128) Nonetheless, the state admitted Guyton's grand jury testimony wherein he testified that he spoke with the police and the ASA at the police station, he did so of his own free will, and no threats or promises were made to him. (Tr. B139-B141)

Not once during the review of Guyton's grand jury testimony did defense counsel object to the impropriety of the admission of the prior consistent statements. "[C]orroboration by repetition 'preys on the human failing of placing belief in that which is most often repeated.'" *People v. Lambert*, 288 Ill.App.3d 450, 458, 681 N.E.2d 675 (2nd Dist. 1997), *quoting, People v. Hudson*, 86 Ill.App.3d 335, 340 (1980) (internal quotations omitted). Plainly stated, repetition does not bestow credibility, which should instead depend on the inherent trustworthiness of the story, not on the number of times the witness has repeated the story. *Id.*

Just because Guyton stated more that once that he saw fire come from the gun does not make it more likely to be true. Nor does the fact that he previously admitted to being treated fine by police and an ASA, or that no threats or promises were made to him, make it so. This is not a situation where defense counsel impeached the witness on these bases and the state needed to rehabilitate his testimony on these points. Quite to the contrary, this occurred on direct examination before defense counsel had risen to ask a single question of Guyton. Defense counsel's failure to object to the introduction of the inadmissible statements

35

**Robinson 002639**

is unexplained by the record, and no strategic reason could possibly exist for the failure to object.

To the extent this issue could have been raised on direct appeal, appellate counsel was ineffective for failing to raise it. The improper bolstering of Guyton's testimony no doubt impacted the weight of the evidence against Petitioner. Guyton was a purported eyewitness whose credibility was weak to say the least. Sitting idly by while the state bolstered their own witness's testimony was a prejudicial mistake on trial counsel's part.

**D.** **Trial counsel was ineffective for failing to object to the introduction of other crimes evidence through the testimony of Detective McDermott.**

During the trial testimony of Detective Timothy McDermott, evidence was introduced that Petitioner was a drug dealer who employed Russell as his seller. McDermott also testified that Guyton decided to come forward because he no longer wanted to take care of the "gang bangers" who killed Hanford himself. (Tr. C111) This evidence had nothing whatsoever to do with the facts of the case, and was in no way related to the circumstances of Hanford's death. Nonetheless, trial counsel failed to object to the admission of the other crimes evidence as inadmissible and prejudicial, and did not request a limiting instruction. Furthermore, trial counsel even revisited the issue on cross examination, reinforcing the fact that Petitioner was a drug dealer.

Evidence of other crimes is not admissible if its only purpose is to prove the propensity of the defendant to commit crime. *People v. Kliner*, 185 Ill.2d 81, 146,

36

Robinson 002640

705 N.E.2d 850 (1998). "'This type of evidence is prejudicial because a jury might convict the defendant because it believes that he is a bad person and deserves punishment.'" *People v. Boand*, 362 Ill.App.3d 106, 124, 838 N.E.2d 367 (2nd Dist. 2005), *quoting, People v. Tolbert*, 323 Ill.App.3d 793, 796, 753 N.E.2d 1193 (5th Dist. 2001). Other crimes evidence is only admissible where it is relevant and aids in the establishment of a material question other than propensity. *Kliner*, 185 Ill.2d at 146. Normally, a judge weighs the probative value of the other crimes evidence against the prejudicial effect to determine the admissibility of the evidence. *Id.*

Here, defense counsel made no objection to the introduction of evidence that Petitioner was a drug dealer, and that he was "gang banger." Nor did counsel request a limiting instruction to advise the jury that such evidence should not be used to establish Petitioner's propensity to commit crime.

Instead, counsel went over Russell's prior handwritten statement on cross examination where he described Petitioner as someone for whom Russell sold drugs. Using the prior consistent statement to reinforce the testimony that Petitioner was a drug dealer is further evidence of counsel's incompetence.

Furthermore, the evidence that Petitioner was a gang banging drug dealer undoubtedly left the jury with the impression that Petitioner's motive for the purported killing of Hanford was either drug or gang related, or both. Aside from this evidence, there was no motive offered for the shooting other than Hanford was a friend of an individual that Petitioner's cousin had previously tried to shoot.

In addition, this evidence was entirely unnecessary to explain the sequence of

37

Robinson 002641

events or circumstances surrounding the incident. Russell testified that he knew Petitioner from contact on the streets. The matter could have simply been left at that. Likewise, McDermott could have merely testified that Guyton decided to help the police because he no longer wanted to take care of things himself. The gratuitous addition of nonessential facts of Petitioner's purported other crimes or bad behavior was entered into evidence despite having no legitimate purpose.

Had the court been given the opportunity to weigh the probative value against the prejudicial effect of the other crimes evidence, the court would have undoubtedly barred it. Trial counsel's failure to object to the admission of this evidence could not have been strategic, and instead greatly prejudiced Petitioner's defense.

In addition, appellate counsel was ineffective for failing to raise this issue on direct appeal. The failure of trial counsel to object to the improper admission of this prejudicial evidence was an issue that could have been raised on direct appeal, but was not. Had this issue been raised on direct appeal, there is a strong probability that Petitioner's appeal would have been granted and the matter sent back to this Court for a new trial without admission of the improper evidence.

IV. **Trial counsel was ineffective for failing to object to the continued inclusion of Juror Mann on the jury after he rode to court with an ASA, where counsel failed to ask any questions that might have revealed improper communications or partiality on Juror Mann's behalf.**

During Petitioner's trial, Juror Mann requested and received a ride to court from an Assistant State's Attorney who was not one of the ASAs trying the case

38

Robinson 002642

against Petitioner. When the court learned of the ride sharing, Juror Mann was questioned briefly, and he indicated that he and the ASA did not discuss the case, and his friendship with the ASA would not impact his fairness. Defense counsel asked no questions of Juror Mann, made no objection to his continued inclusion on the jury, and did not ask that the ASA be questioned concerning the events of the ride sharing.

It is well settled that in order to protect a defendant's constitutional right to a fair trial, "[p]arties or other persons connected with a case or having some interest therein... should carefully avoid private conversations and social intercourse with jurors." *People v. Burns*, 304 Ill.App.3d 1, 6, 709 N.E.2d 672 (1st Dist. 1999). Furthermore, the burden rests with the state to establish that such contact with jurors was harmless to the defendant. *People v. Harris*, 123 Ill.2d 113, 132, 526 N.E.2d 335 (1988); *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450 (1954).

In this instance, the state made no effort to establish that the contact between an ASA and one of the jurors deciding Petitioner's fate was harmless to Petitioner. Indeed, all that was conducted was the most cursory and vague of examinations by the court. Nonetheless, defense counsel failed to object to the procedure in which the matter was handled. The ASA who shared a ride with Juror Mann was never questioned by defense counsel or the court.

All that was asked of Juror Mann was whether any discussions of the case occurred. But that inquiry failed to address all of the potential topics that might have been discussed. For example, the record is silent on whether Juror Mann and

39

**Robinson 002643**

the ASA discussed the attorneys involved in the case, and any opinions Juror Mann may have formed about them. Likewise, the record does not establish whether the ASA discussed his relationship with the two ASAs who were prosecuting Petitioner. There could also have been discussions about the judge, or generally how trials are conducted that would have given Juror Mann information about the process that the jurors would not otherwise have known.

The possibilities of how Juror Mann's ride sharing with an ASA could have impacted Petitioner's case are numerous outside of the very basic inquiry of whether or not they discussed the case. But that was the extent of the inquiry conducted here. As *Remmer* makes clear, a more meaningful hearing should have been held to determine the harmfulness to Petitioner of the improper contact. *Remmer*, 347 U.S. at 229. Defense counsel failed to request such a hearing, and was ineffective for failing to do so. An evidentiary hearing should be granted where Juror Mann, ASA Jeff Allen, and trial counsel can testify to make a more complete record on this matter.

In addition, appellate counsel was ineffective for failing to raise this issue on direct appeal. The insufficiency of the trial court's inquiry was an issue that could have been raised on direct appeal, but was not. Had this issue been raised on direct appeal, there is a strong probability that Petitioner's appeal would have been granted and the matter sent back to this Court for an evidentiary hearing on the improper contact, and ultimately a new trial with an impartial jury.

40

Robinson 002644

## V.   Robinson's Petition Contains Newly Discovered Evidence of His Actual Innocence.

Since the time of Petitioner's trial, one of the so-called eye witnesses against him, Oscar Russell, has come forward and repudiated his identification of Petitioner as the shooter.   A copy of Russell's affidavit is attached hereto as Exhibit K.   As the Illinois Supreme Court has held, a claim of actual innocence based on newly discovered evidence implicates a defendant's right to due process under the Illinois Constitution which is cognizable on a post-conviction petition. *People v. Washington*, 171 Ill.2d 475, 665 N.E.2d 1330 (1996).   When such evidence is presented, a defendant is entitled to a new trial at which the newly discovered evidence can be considered by the jury. *Id.*, at 489.

The due process clause of the Illinois Constitution permits a post-conviction petitioner to assert a freestanding claim of actual innocence based on newly discovered evidence. *People v. Morgan*, 212 Ill.2d 148, 154 (2009).   The newly discovered evidence on which such a claim is based must be "evidence that was not available" at Petitioner's original trial, and that Petitioner "could not have discovered sooner through diligence." *Id.* The evidence must also be material, noncumulative, and "of such conclusive character that it would probably change the result on retrial." *Id.*

Here the new evidence consists of the affidavit of Oscar Russell, the state's main witness against Petitioner.   In his affidavit, Russell states that he was forced to make the statements against Petitioner or he would face charges of his own.

41

**Robinson 002645**

Based on his prior drug record, Russell was told by police that a subsequent charge would result in extensive time in prison. Furthermore, he was told that if he did not testify consistently at Petitioner's trial, the sentence he was then serving could be extended or the old drug charges reinstated.

It was only due to this pressure that Russell agreed to identify Petitioner as the shooter in this case. As Russell makes clear in his affidavit, he did not witness the shooting of Hanford, and has no personal knowledge of who the shooter was. He never saw any of the things he testified to having seen.[9]

Furthermore, the testimony of Russell could not have been procured sooner. Russell's affidavit makes clear that he continued to maintain his story against Petitioner out of fear for his own future. It was only after having the time to consider what he had done that Russell was willing to come forward and correct the error in judgement he made in agreeing to falsely identify Petitioner as the shooter of Hanford.

Without the testimony of Russell, the state's evidence against Petitioner was virtually non existent. Guyton repudiated his identification of Petitioner as the shooter during his trial testimony, instead stating that he never saw Petitioner actually shoot Hanford, only that the shots came from the direction which Petitioner and his cousin were standing.

When the new evidence proffered by Russell is considered in conjunction with

---

[9] That Russell did not see what he originally claimed is corroborated by the affidavits of the individuals Russell claims witnessed the shooting along with him. As discussed herein, these individuals were not present.

42

Robinson 002646

the extensive evidence previously discussed, and which trial counsel failed to procure and present to the jury, there is little doubt that Petitioner would be acquitted at a retrial. Petitioner has evidence that he was not present at the time of the shooting; that Lamarius admitted to the shooting to two separate individuals very shortly after the incident; that Lamarius admitted to the shooting in a letter authenticated by a third party familiar with his handwriting; and, that Lamarius expressed remorse for having gotten Petitioner convicted for this crime. Petitioner is entitled to a new trial where he can present the affidavit of Russell where he repudiates his identification of Petitioner as the shooter in this case.

WHEREFORE, Petitioner respectfully requests this Court grant his Petition for Post-Conviction Relief, reverse his conviction, order a new trial, or grant him an evidentiary hearing to further support the allegations contained herein.

Respectfully submitted,

**JODI L. GARVEY**, One of the
Attorneys for Petitioner.

**BLEGEN & GARVEY**
53 West Jackson Boulevard, Suite 1437
Chicago, Illinois 60604
(312) 957-0100

Robinson 002647

## CERTIFICATE OF SERVICE

**JODI L. GARVEY,** attorney at law, hereby certifies that on June 24, 2014, she served, or caused to be served, the foregoing Petition for Post-Conviction Relief upon the Cook County State's Attorney's Office, by hand delivery.

JODI L. GARVEY

**Robinson 002648**

STATE OF ILLINOIS )
                   ) SS
COUNTY OF RANDOLPH )

## AFFIDAVIT

1.  Affiant is Allen Robinson, the defendant in the matter of *People v. Allen Robinson*, No. 09 CR 6442, in the Circuit Court of Cook County.

2.  Affiant hereby verifies that the facts and allegations contained in this Petition are true and accurate based on his information and belief.

_Allen Robi___ R67377_

**ALLEN ROBINSON**, Inmate No. R67377

Subscribed and sworn to
before me this 18th day of
June, 2014

_____
Notary Public
My Commission Expires 6-4-16

BRAD BRAMLET
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires
June 04, 2016

**Robinson 002649**

STATE OF ILLINOIS )
                            ) SS
COUNTY OF RANDOLPH )

## AFFIDAVIT

1.    Affiant is Allen Robinson, the defendant in the matter of *People v. Allen Robinson*, No. 09 CR 6442, in the Circuit Court of Cook County.

2.    Affiant told his trial counsel to speak with Quinton Martell Davis and Jenee Moreland, both of whom were with Lamarius Robinson shortly after the shooting. Affiant informed his attorney that Mr. Davis and Ms. Moreland would testify that Lamarius admitted to having committed the shooting.

3.    Affiant also informed his attorney that Mr. Davis could also identify Lamarius's handwriting in the letter Affiant received from Lamarius, wherein Lamarius admitted that he shot Hanford not Affiant.

4.    In addition, Affiant provided counsel with the names of several individuals, all of whom were named by Oscar Russell in his handwritten statement and grand jury testimony, including Johntay Washington (Tay), Ozell Jackson (Ozell), February Burage (Feb), and Jamion Winters (Big Shorty), and requested that they testify on Affiant's behalf. Affiant informed his counsel that each of the witnesses would have been able to confirm that Russell did not see them at the shooting of Christopher Hanford because they were not there despite Russell's statements to the contrary.

5.    Affiant also told counsel of another witness, Aaron Marshall. Affiant advised his counsel that Mr. Marshall was Mr. Hanford's "chief", who Russell mentioned in his statement and grand jury testimony. Affiant informed his counsel that Mr. Marshall would testify that there was no exchange of heated words between Mr. Marshall, Mr. Hanford and Affiant two weeks prior to the shooting. Indeed, Affiant informed his counsel that Mr. Marshall would testify that

**EXHIBIT**

NO. *A*

**Robinson 002650**

he and Affiant had nothing but a friendly relationship.

      6.    In addition, Affiant told his counsel to speak with his mother, Latanya Fleming. On the night of the shooting, Affiant had gone to pick his mother up from work at Dominick's on Halsted and Madison in Chicago. Affiant's mother was scheduled to work until 9:00 p.m. that night, and Affiant went into the store at approximately 9:00 p.m. to let her know he was there. Affiant purchased a Snickers candy bar, and then waited in the car in the parking lot for his mother to finish her shift.

      7.    None of the witnesses Affiant told his attorney to speak with were ever called to testify on Affiant's behalf. Instead, counsel presented no evidence or testimony to refute the State's evidence.

**ALLEN ROBINSON**, Inmate No. R67377

Subscribed and sworn to
before me this 18th day of
June, 2014

Notary Public
My Commission Expires 6-4-16

BRAD BRAMLET
OFFICIAL SEAL
Notary Public - State of Illinois
My Commission Expires
June 04, 2016

2

Robinson 002651

STATE OF ILLINOIS        )
                         ) SS
COUNTY OF COOK           )

## AFFIDAVIT

1.    Affiant's name is Jenee Moreland.  Affiant is the mother of a child with Allen

Robinson.

2.    On December 3, 2008, after 9:15 p.m., Affiant received a call from Lamarius

Robinson, who is the cousin of Allen.  Lamarius asked Affiant to pick him up at Cicero and

Chicago Avenue, in Chicago.

3.    When Lamarius got into Affiant's car, he was acting very nervous.  As they drove

away from Cicero and Chicago Avenue, Lamarius stated that he had just killed someone.  Affiant

was very upset by this statement, and told Lamarius that he needed to get out of her car.

4.    Affiant then dropped Lamarius off at a gas station at Madison and Cicero, in

Chicago.

5.    Affiant was never contacted by any attorney or investigator for Mr. Robinson

prior to his trial.  Had anyone contacted Affiant, she would have testified at Mr. Robinson's trial

consistent with the facts set forth herein.

_____
JENEE MORELAND

Subscribed and sworn to
before me this 17th day of
June, 2014

_____
Notary Public
My Commission Expires 1/2/17

Official Seal
Matthew Amarin
Notary Public, State of Illinois
My commission expires January 2, 2017

**EXHIBIT**

**NO.** B

**Robinson 002652**

STATE OF ILLINOIS )
                        ) SS
COUNTY OF COOK )

## AFFIDAVIT

1.       Affiant is Quinton Martell Davis. Affiant has known both Allen Robinson and Lamarius Robinson for approximately 20 years, and he is a close acquaintance of both.

2.       On December 3, 2008, after approximately 9:15 p.m., Affiant received a phone call from Lamarius Robinson. Lamarius asked Affiant to pick him up at a gas station at Madison and Cicero.

3.       Affiant went to the gas station with his girlfriend and picked up Lamarius. Affiant then took Lamraius to Affiant's grandmother's house at 1517 South Central Park, in Chicago.

4.       On the way to Affiant's grandmother's house, Lamarius told Affiant that he had just shot "13." Lamarius showed Affiant a chrome and black .45 handgun that Lamarius said was the murder weapon. Lamarius told Affiant that he was on Lawler Street when he saw "13" coming out of a house. Lamarius told Affiant that he ran up on "13" and shot him several times. Affiant's girlfriend was present for this conversation.

5.       Lamarius told Affiant that after the shooting, he called Jenee Moreland to pick him up, and then he called Affiant to meet him at the gas station.

6.       After Lamarius told Affiant what he had done, Affiant called Allen Robinson, and told him to come to Affiant's grandmother's house. Affiant is aware that at the time of the shooting, Allen had been picking his mother up from work at Madison and Halsted. Affiant was present when Lamarius told Allen about the shooting.

7.       After the shooting death of "13", Lamarius stayed close to Affiant in Lamarius's for two to three months. Lamarius had a very difficult time dealing with the fact that he had



**EXHIBIT**

NO. C

**Robinson 002653**

killed someone and was afraid to be alone. Affiant is aware that Lamarius started using more drugs to cope with the guilt of having killed someone.

8.     Since Allen's arrest, Lamarius sent Affiant a letter where in Lamarius expressed his desire to make amends with Allen for putting the murder of "13" on Allen. A copy of the letter is attached.

9.     Based on Affiant's 20-year friendship with Lamarius, Affiant is very familiar with Lamarius's handwriting and could identify it from letters that were written to him and others.

10.     Affiant told Allen that he would testify on Allen's behalf at Allen's trial to the matters contained in this affidavit. Affiant was never contacted or interviewed by an attorney or investigator on Allen's behalf, however, and was thus never called to testify in Allen's defense.

**Robinson 002654**

_Quinton Davis_
**QUINTON MARTELL DAVIS**

Subscribed and sworn to
before me this 12th day of
June, 2014

_Matthew Amarin_
Notary Public
My Commission Expires 1/2/17

Official Seal
Matthew Amarin
Notary Public, State of Illinois
My commission expires January 2, 2017

Q wats good bro how you holding in how every
thing coming along wit yo case. everything is alrite
for you doe. You know dude was telling me all
this on the four you dont have to worry about
here and his homies. He said he'll never get down
and the court, like that. Man bro I miss the shit
out. you doe. Forreal and I had to write you this
letter cause I hear how niggas out there putting
my name in the dirt Q. Jello just told me they
gave B.t. fifty five years, that's krazy man. I mean
niggas dont know but that shit hurted me just
as much Q, I tryed everything in that shit bro. I
even added myself to his case so they wouldn't use
nonthing I said against him bro. Um tell Your
everything doe about that. Look rite them people
came and took me out of bootcamp on a courtrag.
when we got to the county the states was trying to
get me to go in on bro. they talking bout if I go out
there and do wats rite and say the same thing
over I dont have nonthing to worry about, but
if I say anything different they gonna make sure
I get as much as time as him. So they left
then a P.d. come and holla at me telling
me my options, so I ask him how a can I

Robinson 002656

protect B.A. he told me if I plead the fifth they cant use nothing I said against B.A. but it add you to the case, something like I don't wanna say nothing because I don't want to say nothing cause it may harm me on this case, so um like thats wat I'mma do. Then the states come back in there wit a letter talking bout did you write this, um like wat is it, it's a letter saying you killed dude, um like hell nall then he got to talking about he spoke wit my money and she say that my hand writing um like thats not mines I know they was lieing doe my mama wont do know shit like that they called me out, the states ask me wat happen I said I wasn't there then I pleaded the fifty he get pissed I could see it and his face. Now B.A. lawyer ask me about the letter saying you wrote dis. I told him befor I wrote that letter all that shit um like this crazy, so now the judge tell me to go back in the back all the C.O. talking bout you crazy why you just do that you know they gonna charge you now um thinking in my head longs it help bro, but he got this letter in there um it lost now, they took me back down ere, told me I can't go back to bootcamp

because I have a case planning against me. the hearing I got down on B.t. doe. Now ~~me~~ me and tell had this talk, and my uncle wayne. On Dave on my dead granddaddy wat happen and the police station was different. And I admit to wat I did but B.t. wont tell everybody the truth. He told then people every move I even made out there Q, they was asking me about old moves a nigga made how would they know that then they started saying shit about wat happen wit the other dude fust and how I got mad and made him park the car and walk over there after that shit. shit that You had to be there to know. I had them gone at fust they wasnt even questioning me after they check the hospetal recoid until dude started talking. Now don't get it twisted bro, that shit wasnt ite wat I did on him but he was getting down on me so I had no choice, tho police even telling me like just thik we heard wat happen at fust wit dude you couldnt get him than five minutes later that happen. they even told me wat the <u>bitch look like</u>. I told tells and wayne, tells got it out of him but he wont say it to know body esle, if I was dead wrong tells wouddnt have.

Robinson 002658

no respect for me any more, tells was even mad about the letter that he did, but I told tell don't be let him do what he gotta do. And my kids bro I would never go against him in a court room in front of no people even if he trying to get me slam. But all this comes back to him talking to those hoes on the phone all day about that shit, he was saying he did it then Now he saying he didn't when the heat got on, I was out every day cuz bro taking chances with my life for him and all that shit was over nothing, They took one of my best friends away from me, I asked my aunt pam and wayne to help him get appeal they said thy gon do every thing thy can. Niggas think I just got down on him; I love deade to much even after the fact, but he used to do me so I had to, And like I say I still love him, Beside him, you, tells, phil and ant the only niggas I'll talk to about this shit cause it's always to sides to a story, and this that one niggaro I been from the start Q, I think he may hate me now because I wouldn't say I wrote that letter but wnna try my best to show him different, show him I still love him and bust that demo out there

**Robinson 002659**

soon I touch, wat you think, and your homie
leo man you better holla at him, on dave
I got to much on my mind about my
cuz, hurting to hard for him and dis nigga
wanna send a message talking about I cant
come on 16th street, bitch ass nigga you not even
off 16th street on top of that you is a stright
bitch, I cant even recall the bitch even box
a nigga befor, On my granddaddy I'll fuck
leo up when I touch and who ever wanna
help him On Dave Juju blew me when she told
me that wher the hoe ass nigga dont know
shit about wat um going threw that dude
aint even been threw shit besides getting shot,
I um Mentally fucked up rite now every single
day I be bugging, old heads be trying to holla
at me, I wish that shit never went on, I still
prey for us all every day bro. I cant give up,
I hope you pray for us too. I had to write some
body I can holla at, that shit aint cool, putting
a nigga name in the dirt and you dont know
shit about shit, And I been keeping up wit
you to nigga, tells told me you start
your trial en september rite. You know
I had a lel boy rite you gotta hurry up out

Robinson 002660

there so you could be his god daddy, My
nama told JuJu she was gon get me my own
place for us when I touch out there but who
knows if em coming home, Im still under
investagation and the counselor wont even
write or come see you down here, this
hit crazy down here doe, Boo Been down
here, he get out in december and Moosie
get out in Feb 2013. A Its a few people a
lil older off 15th christany in here too, keep in
touch wit me doe bro threw JuJu, write
me back, tell grandma and J-lo I said
hey to. Bro this is a krazy life man and
shit dont never work out rite so imma tell you
ke I told Tells when you get a chance again
lo rite, take care of family and try and stay
it the streets, fuck them streets they full of
rakes that turn so easy. But the one person I do
re about she still got my back thats all I need ef
touch I probberly go down wit her and my son,
t of I still remember him genna fucke Leo cup,
irst, for you too. I never knew to now how he
id you, but just stay strong in them keep
o fiath to 100, always say a preyer bro, I
love you Q, yman holla at you later Alrite
"Dont keep this letter tear it up"

STATE OF ILLINOIS     )
                      ) SS
COUNTY OF COOK        )

## AFFIDAVIT

1.      Affiant's name is Latanya Fleming.  Affiant is the mother of Allen Robinson.

2.      On December 3, 2008, Affiant was working at Dominick's grocery store at Madison and Halsted, in Chicago, from 2:30 p.m. until 9:00 p.m.  Records reflecting Affiant's work schedule that day are attached hereto.

3.      Affiant's son, Allen Robinson, dropped Affiant off at work and took Affiant's car. Affiant was to be picked up by Mr. Robinson when her shift ended at 9:00 p.m. because she did not have a car.

4.      Moments before her shift ended at 9:00 p.m., Affiant was asked to work until 10:30 p.m.  At 9:00 p.m., Mr. Robinson entered the Dominick's to pick up Affiant.  Affiant informed him that she would be working until 10:30 p.m., and told him to wait in the car in the parking lot.

5.      Affiant observed Mr. Robinson purchase a candy bar, and then exit the store. When Affiant got off work, Mr. Robinson was waiting in her car in the parking lot, and he then drove Affiant home.

*Latanya Fleming*
**LATANYA FLEMING**

Subscribed and sworn to
before me this 11ᵗʰ day of
June, 2014

*Matthew Amarin*
Notary Public
My Commission Expires 1/2/17

Official Seal
Matthew Amarin
**Notary Public**, State of Illinois
**My commission expires** January 2, 2017

**EXHIBIT**

NO. D

**Robinson 002662**

DATE : 03/30/09

TIME : 17:03:02

TIME CARD REPORT

ME : FLEMING, LATANYA
EMPL # : 0328703419   PAY RULE : 01   JOB # : 01600   CASHIER

Y PERIOD : 11/30/08 Thru 12/06/08
BADGE # : 0328703419   STATUS : PT   DEPT # : 00000016   FRONT END

| DATE | TYPE | IN | OUT | JOB CODE | DEPT CODE | REG | OVT 1 | OVT 2 | T-HRS | CODE | HOURS | MESSAGE |
|------|------|----|----|------|------|------|-------|-------|-------|------|-------|---------|
| /30/08 | REG | 10:09 C | 13:20 C | | | 0.00 | 3.00 | 0.00 | 3.00 | | | |
| | BRK | 13:20 C | 13:41 C | | | 0.00 | 0.50 | 0.00 | 0.50 | ?LBRK | | LONG BREAK |
| | REG | 13:41 C | 16:45 C | | | 0.00 | 3.00 | 0.00 | 3.00 | | | |
| | BRK | 16:45 C | 17:02 C | | | 0.00 | 0.25 | 0.00 | 0.25 | | | |
| | REG | 17:02 C | 18:11 C | | | 0.00 | 1.25 | 0.00 | 1.25 | | | |
| | | | DAILY HOURS | | | 0.00 | 8.00 | 0.00 | | | | |
| /01/08 | REG | 14:06 C | 17:38 C | | | 3.75 | 0.00 | 0.00 | 3.75 | | | |
| | BRK | 17:38 C | 17:57 C | | | 0.25 | 0.00 | 0.00 | 0.25 | ?LBRK | | LONG BREAK |
| | REG | 17:57 C | 20:46 C | | | 2.75 | 0.00 | 0.00 | 2.75 | | | |
| | BRK | 20:46 C | 21:15 C | | | 0.50 | 0.00 | 0.00 | 0.50 | ?LBRK | | LONG BREAK |
| | REG | 21:15 C | 21:55 C | | | 0.75 | 0.00 | 0.00 | 0.75 | | | |
| | | | DAILY HOURS | | | 8.00 | 0.00 | 0.00 | | | | |
| /02/08 | REG | 14:37 C | 17:40 C | | | 3.25 | 0.00 | 0.00 | 3.25 | | | |
| | BRK | 17:40 C | 17:57 C | | | 0.25 | 0.00 | 0.00 | 0.25 | | | |
| | REG | 17:57 C | 20:48 C | | | 2.75 | 0.00 | 0.00 | 2.75 | | | |
| | BRK | 20:48 C | 21:06 C | | | 0.25 | 0.00 | 0.00 | 0.25 | ?LBRK | | LONG BREAK |
| | REG | 21:06 C | 22:12 C | | | 1.25 | 0.00 | 0.00 | 1.25 | | | |
| | | | DAILY HOURS | | | 7.75 | 0.00 | 0.00 | | | | |
| /03/08 | REG | 14:30 C | 17:49 C | | | 3.25 | 0.00 | 0.00 | 3.25 | | | |
| | BRK | 17:49 C | 18:07 C | | | 0.25 | 0.00 | 0.00 | 0.25 | ?LBRK | | LONG BREAK |
| | REG | 18:07 C | 20:22 C | | | 2.25 | 0.00 | 0.00 | 2.25 | | | |
| | BRK | 20:22 C | 20:40 C | | | 0.50 | 0.00 | 0.00 | 0.50 | ?LBRK | | LONG BREAK |
| | REG | 20:40 C | 22:30 C | | | 1.75 | 0.00 | 0.00 | 1.75 | MAN | | MANUAL EDIT |
| | | | DAILY HOURS | | | 8.00 | 0.00 | 0.00 | | | | |
| /04/08 | REG | 14:20 C | 17:31 C | | | 3.25 | 0.00 | 0.00 | 3.25 | | | |
| | BRK | 17:31 C | 17:52 C | | | 0.25 | 0.00 | 0.00 | 0.25 | ?LBRK | | LONG BREAK |
| | REG | 17:52 C | 20:56 C | | | 3.25 | 0.00 | 0.00 | 3.25 | | | |
| | BRK | 20:56 C | 21:14 C | | | 0.25 | 0.00 | 0.00 | 0.25 | ?LBRK | | LONG BREAK |
| | REG | 21:14 C | 22:12 C | | | 1.00 | 0.00 | 0.00 | 1.00 | | | |
| | | | DAILY HOURS | | | 8.00 | 0.00 | 0.00 | | | | |

Robinson 002663

N DATE : 03/30/09

TIME : 17:03:02

TIME CARD REPORT

ME : FLEMING, LATANYA

Y PERIOD : 11/30/08 Thru 12/06/08

EMPL # : 0328703419

BADGE # : 0328703419

PAY RULE : 01

STATUS : PT

JOB  # : 01600     CASHIER

DEPT # : 00000016    FRONT END

| DATE | TYPE | IN | OUT | JOB CODE | DEPT CODE | REG | OVT 1 | OVT 2 | T-HRS | CODE | HOURS | MESSAGE |
|------|------|------|------|------|------|------|------|------|------|------|------|------|
| /05/08 | REG | 14:23 C | 17:37 C | | | 3.00 | 0.00 | 0.00 | 3.00 | | | |
| | BRK | 17:37 C | 17:53 C | | | 0.50 | 0.00 | 0.00 | 0.50 | | | |
| | REG | 17:53 C | 20:59 C | | | 3.00 | 0.00 | 0.00 | 3.00 | | | |
| | BRK | 20:59 C | 21:29 C | | | 0.50 | 0.00 | 0.00 | 0.50 | ?LBRK | | LONG BREAK |
| | REG | 21:29 C | 22:25 C | | | 1.00 | 0.00 | 0.00 | 1.00 | | | |
| | | | | | | ----- | ----- | ----- | | | | |
| | | | | DAILY HOURS | | 8.00 | 0.00 | 0.00 | | | | |

GULAR HOURS            39.75

ERTIME 1 HOURS          8.00
                   ----------
TAL HOURS             47.75

Robinson 002664

Weekly Work Schedule for Store Store 1875 - Week Ending 12/6/2008
Activities : Dairy, Deli, GMHBC, Floral, Production, Produce, Meat Clerk, Bookeeper, File Maintenance, Checker, Courtesy Clerk

| Emp name | Sun-11/30/2008 | Mon-12/1/2008 | Tue-12/2/2008 | Wed-12/3/2008 | Thu-12/4/2008 | Fri-12/5/2008 | Sat-12/6/2008 | Total |
|---|---|---|---|---|---|---|---|---|
| **Activity: Checker** | | | | | | | | |
| BAKER,JESSE 1st Activity -> Daily Hours -> | Unavailable | | | | | | | |
| ANZALONE-COZZI,MARY A 1st Activity -> Daily Hours -> | Vacation | Vacation | Vacation | Vacation | Vacation | Vacation | Vacation | |
| MARTINEZ,ANDREW M 1st Activity -> Daily Hours -> | Requested | Requested | Requested | Requested | Requested | Requested | Requested | |
| WINFREY,TIMOTHY 1st Activity -> Daily Hours -> | 6:00AM-12:00PM Checker 6.0 | 6:00AM-1:30PM Checker 7.5 | 6:00AM-1:30PM Checker 7.5 | 6:00AM-1:30PM Checker 7.5 | 6:00AM-1:30PM Checker 7.5 | 6:00AM-1:30PM Checker 7.5 | 0.0 | 43.5 |
| COOK,LORRAINE A 1st Activity -> Daily Hours -> | 7:00AM-1:00PM Checker 6.0 | 7:00AM-2:30PM Checker 7.5 | 7:00AM-2:30PM Checker 7.5 | 7:00AM-2:30PM Checker 7.5 | 0.0 | 7:00AM-2:30PM Checker 7.5 | 6:00AM-1:30PM Checker 7.5 | 43.5 |
| BURNS,NANCY A 1st Activity -> Daily Hours -> | 8:00AM-2:00PM Checker 6.0 | 3:30PM-10:00PM Checker 6.5 | 8:00AM-3:30PM Checker 7.5 | Requested 0.0 | 7:00AM-2:30PM Checker 7.5 | Requested 0.0 | 7:00AM-2:30PM Checker 7.5 | 35.0 |
| FLEMING,LATANYA Y 1st Activity -> Daily Hours -> | 9:30AM-3:30PM Checker 6.0 | 2:30PM-9:00PM Checker 6.5 | 2:30PM-9:00PM Checker 6.5 | 2:30PM-9:00PM Checker 6.5 | 2:30PM-9:00PM Checker 6.5 | 2:30PM-9:00PM Checker 6.5 | Requested 0.0 | 38.5 |
| HICKS,LATONYA 1st Activity -> Daily Hours -> | 3:00PM-9:00PM Checker 6.0 | 8:00AM-3:30PM Checker 7.5 | 9:00AM-3:30PM Checker 6.5 | 8:00AM-3:30PM Checker 7.5 | 8:00AM-3:30PM Checker 7.5 | 8:00AM-3:30PM Checker 7.5 | Requested 0.0 | 42.5 |
| SAIN,GIOVANNI 1st Activity -> Daily Hours -> | 10:00AM-4:00PM Checker 6.0 | 9:00AM-3:30PM Checker 6.5 | Unavailable 0.0 | 0.0 | 0.0 | 9:00AM-3:30PM Checker 6.5 | 8:00AM-3:30PM Checker 7.5 | 26.5 |
| WALKER,APRIL 1st Activity -> Daily Hours -> | Unavailable 0.0 | Unavailable 0.0 | 3:00PM-9:30PM Checker 6.5 | Requested 0.0 | 3:00PM-9:30PM Checker 6.5 | Requested 0.0 | 9:30AM-4:00PM Checker 6.5 | 19.5 |
| WALTON,LATONYA D 1st Activity -> Daily Hours -> | 11:00AM-5:00PM Checker 6.0 | 10:30AM-5:00PM Checker 6.5 | 1:30PM-8:00PM Checker 6.5 | 9:00AM-3:30PM Checker 6.5 | 9:00AM-3:30PM Checker 6.5 | Requested 0.0 | Requested 0.0 | 32.0 |

Robinson 002665

STATE OF ILLINOIS  )
                   ) SS
COUNTY OF COOK     )

## AFFIDAVIT

1.  Affiant is Ethel Lewis.

2.  Affiant was employed at the Dominick's grocery store located at Halsted and Madison in December 2008. Affiant is acquainted with LaTanya Fleming as a former co-worker at the same store.

3.  On a winter day in 2008, Affiant was working with Ms. Fleming. During Affiant's shift, late in the evening, possibly around 9:00 p.m., Affiant was introduced to Ms. Fleming's son, Allen Robinson, who she had seen in the store on prior occasions picking up Ms. Fleming.

4.  While Affiant does not remember the exact date she was introduced to Mr. Robinson, she recalls it was on a day when he came to pick up Ms. Fleming, but then Ms. Fleming had to stay later at work. It was unusual for someone to work longer than their scheduled shift, which is why Affiant remembers the incident.

5.  Affiant did not see Mr. Robinson after that night, and subsequently learned from Ms. Fleming about his arrest.

6.  Affiant was never contacted by any attorney or investigator for Mr. Robinson prior to his trial. Had anyone contacted Affiant, she would have testified at Mr. Robinson's trial consistent with the information contained herein.

_Ethel Lewis_
**ETHEL LEWIS**

Subscribed and sworn to
before me this 18th day of
June, 2014

_Matthew Amarin_
Notary Public
My Commission Expires 1/2/17

```
Official Seal
Matthew Amarin
Notary Public, State of Illinois
My commission expires January 2, 2017
```

**EXHIBIT**

NO. _E_

**Robinson 002666**

STATE OF ILLINOIS )
) SS
COUNTY OF COOK )

## AFFIDAVIT

1.     Affiant is Johntay Washington, a.k.a. Tay, an acquaintance of Allen Robinson.

2.     Affiant was taken to the police station at Grand and Central approximately one or two weeks after the shooting death of Christopher Hanford in December 2008. When Affiant was taken to the police station, he was placed in a police wagon with approximately five other individuals who were all picked up at the same time.

3.     Affiant was interrogated by police at Grand and Central about having witnessed the shooting of Hanford. Affiant informed the police that he was not present at the time of the shooting, and did not know anything about it.

4.     Affiant was never contacted by any attorney or investigator for Mr. Robinson prior to his trial. Had anyone contacted Affiant, he would have testified at Mr. Robinson's trial that he did not witness the shooting of Hanford, and that anyone who said otherwise was not telling the truth.

_JohntayWAshington_
JOHNTAY WASHINGTON

Subscribed and sworn to
before me this 12th day of
June, 2014

_Matthew Amarin_
Notary Public
My Commission Expires 1/2/17

> Official Seal
> Matthew Amarin
> Notary Public, State of Illinois
> My commission expires January 2, 2017

**EXHIBIT**

NO. _F_

**Robinson 002667**

STATE OF ILLINOIS    )
                        ) SS
COUNTY OF BROWN   )

## AFFIDAVIT

1.     Affiant is Ozell Jackson, an acquaintance of Allen Robinson.

2.     On December 3, 2008, Affiant was in the Audi Home, in Chicago, on a drug charge. Due to his custody, Affiant could not, and in fact did not, witness the shooting of Christopher Hanford, who Affiant knew as "13".

3.     Affiant was released from the Audi Home later in December 2008, and heard about the shooting of "13" after Christmas of that year. Affiant heard from Oscar Russell, as well as many other individuals, that Allen Robinson's cousin was the shooter of "13".

4.     Affiant was never contacted by any attorney or investigator for Mr. Robinson prior to his trial. Had anyone contacted Affiant, he would have testified at Mr. Robinson's trial that he did not witness the shooting of Hanford, and that anyone who said otherwise was lying.

_____

**OZELL JACKSON**

Subscribed and sworn to
before me this ___ day of
June, 2014

_____

Notary Public
My Commission Expires _____

**EXHIBIT
NO. G**

**Robinson 002668**

STATE OF ILLINOIS )
                     ) SS
COUNTY OF COOK    )

## AFFIDAVIT

1.    Affiant's name is Aaron Marshall.  Affiant has been acquainted with Allen Robinson for a number of years.

2.    Affiant was in custody from November 20 or 21, 2008, and was not released until June 12, 2009.

3.    Affiant did not have heated words with Mr. Robinson, and they have always been on good terms.  Nor was Affiant present for or aware of any such exchange of words between Christopher Hanford and Mr. Robinson.  Affiant has learned that an individual named Oscar Russell claimed that Affiant and Mr. Robinson got into argument two weeks prior to the shooting death of Mr. Hanford.  No such argument ever occurred and Affiant has never held any feelings of ill will toward Mr. Robinson.  Furthermore, two weeks prior to the shooting of Mr. Hanford, Affiant was in the custody of the Cook County Sheriff.

4.    Affiant and Mr. Robinson discussed his potential testimony on Mr. Robinson's behalf at his trial.  Affiant was willing to testify to the matters contained in this affidavit, but he was never contacted by anyone representing Mr. Robinson.

_____
AARON MARSHALL

Subscribed and sworn to
before me this _10th_ day of
June, 2014

_____
Notary Public
My Commission Expires _1/2/17_

Official Seal
Matthew Amarin
Notary Public, State of Illinois
My commission expires January 2, 2017

**EXHIBIT**

**NO.** H

**Robinson 002669**

Baby A1                                    1-21-00


      Wat up bro. Man um be honest from ma heart
wit you bro them people may have trick me but I was
never thinking bout maself b-4 I told them that they
already was sayn what happen bro they wasn't on shit at
first cuz I wasn't telln them shit bro on dave they was
going wit what I told them, I was tilling them that I
was fucked up around that time cuz remember I got cut on
the arm they was gon wrt it they even seen my hospital
records so they was believen me then it change it seen
like somebody had start telln them sum parts of what
  happen like what really blow ma mind when I was in
    there when they said sumbody was telln me to get
right get right um like what thats y I wrote that on that
mirra or code bro cuz I thought you was talkn then they
bought up that stunt on larmie wit dude i really started gettin
salted but I still didnt say nothing then the last time they
came n they told me like you been charge wit a first degree
and we gon be letting yo cuzn go I was like how you aint shit
on me then I set n there thinkn 4 like 2 hours or sumthing
and was jus like it fuck it he tryn to put all blame on me so
I called they dude back n was like told them what happen
but put you n my shoes I swear on granddaddy god I could kill
ma baby or grandma I was never was just tryn to get myself
out I kno I could neva get you 2 believe me BA again but
thats was how it went bro man I been thinkn real hard about
  this bro so dont neva think I 4got about you when you
  say about money if I had any we would split it bro this
from my heart n I mean it dont go no other way around it
if i tell you have noway of winning this then so b bro this would

**EXHIBIT**

NO. __I__

**Robinson 002670**

b ma last summer out here on our granddaddy I want you to tell what happen n I would take ma weight to free you what um sayn is I did it you wasn't even there I could do the time cuz its minds anyway n when I b askin you do you need something you always say NO like you dont what nothing from me um gettin a income tax n And gon look for on that bro on the money side I been fucked up I have ma own weed but that lil money dont b shit there's nobody around here doin way better then the next everybody around here sale weed shit real fucked up been jus tryn to spend as much time wit grandma and ma baby so when it do happen I would be alright I want you to follow your heart like I told you if we cant win this then so be it tell yo laywer wats going on n let me kno bro I would give ma life 4 yo life

I Love you BA n I neva ever wanted this shit this way I licked the page at the bottom so ma DNA could be on here even if you have 2 use this, nobody n this world was ma best friend cuz, brother like you was to me And I fucked up the best thing I had when you come bro I kno me and you would neva b the same but I would always ♥ you ma life al yeah I could yo laywer again he didnt answer I left him sum numbers to call again I kno I got to talk to him b-4 the 1st bro gon do what he need me to like I said even if it mean tradn places god could kill grandma I got bro dont worry bout me if it get to cum 2 that jus we gon make it happen um hear bro ma heart steal the game 4 you its jus that bullshit is killin me to bro I stress to bro preyin 4 you I Love you bro dont listen to nobody bro follow ya heart n um gon respect what ever it says and thats from ma heart

right here ↘    Love Madi

write me BACK n tell me

Robinson 002671

LaMarius Robinson
16S.S.Central Park
Chicago IL, 60623

(17)

Allen Robinson 2009002300 3
Div 1 A4
P.O. Box 089002
Chicago IL 60608

60608-9002

UNITED STATES POSTAGE
$ 00.440
MAILED FROM ZIP CODE 80501

Robinson 002672

Send This to
BABy-Al tanya
Thanks

EXHIBIT
NO. J

Robinson 002673

Wuts up B.A. I wanna ask you how you feelen but I could only imange. I had wrote you a letter about a month ago threw tells and had him to send it to you I don't Know if you got it cause you didn't respone to it. I Know as of now you must hate me to death and say we are never cuzin any more but I don't want you to fill that way. Look some way I gotta make this right. I just hope we get you back first. I Know you got you another lawyer, cause your last one wasn't on shit. Don't you think its many ways of me making something happen the right way besides just giving up. Your last lawyer wasn't right but I understand he was your lawyer, its like all he was study trying to get me to do was say wut he wanted to hear. He made me fill like he never had any Kind of defence on how to fight your case. I be in here every single day thinking about you. Hoping and preyin for you. Do you every fill like hope is gone bro, cause if you do you don't never have to fill that way. It's gonna turn around for you, Wat ever I have to do to help um here bro, I just gotta be able to have a fight for me. Thats why

**Robinson 002674**

I was sayin your lawyer wasn't on anything, he wanted me to put myself in a situation were um not gonna beable to do nonething but lay down you know. But I never give up or forgotten about you or think its over, on my kids life. You problemly don't wanna hear from me, but I just gotta know things are in the happing for you. Our homies, don't worry about them, we gon have a ball when I touch. For some reason I be filling like the case was weak as hell doe. Like a lawyer like baby-bay had he would have beaten this bro. I hope you find in your heart to still look at me as your cuzin even if we don't gotta be like we was when you get back. I won't you to write me back baby-Al and holla at me alrite. But um still in your corner to do wat I can and anyway. is there anybody you know down there doe, is you cool bro or is its ugly, cause these police down here be treatin niggas, here go a picture of my son he a jr too. I hope they ginuration don't have its as hard like us. You know its six of them. Just stay Strong cuz, don't loose your faith, why don't you ever contact grandma, I always ask her have she talk to you and she say's no. Why don't you write her and say hey bro. We all still family don't be mad at nobody but me, cause I fucked up big time but I'll never turn my back on you baby-Al Never

Robinson 002675





**Robinson 002676**

Lamarius Robinson R-65541
    Shawnee Corr Center
6665. State Rt 146 E
Vienna, Ill, 62995

USA
FIRST-CLASS
FOREVER

Latanya Fleming
1656, South Central Park
Chicago, Ill 60623

6062332523

Robinson 002677

STATE OF ILLINOIS     )
                      ) SS
COUNTY OF JOHNSON )

## AFFIDAVIT

1.     Affiant is Oscar Russell, who testified for the state at the trial of Allen Robinson.

2.     With respect to his statement in early March 2009, and his grand jury testimony in late March 2009, Affiant states that he was forced to make the statements against Mr. Robinson.

3.     In early March 2009, Affiant was taken into custody by officers of the Chicago Police Department, and brought to the police station at Madison and Menard, in Chicago. Affiant was informed by the officers that if he did not testify against Mr. Robinson in the shooting of Mr. Hanford, Affiant would be charged with possession of heroin. Affiant signed the statement that was written by the State's Attorney because he already had four prior felony drug convictions and was afraid he would be charged with another drug case if he refused. Affiant also signed a photo array at this time identifying Mr. Robinson. Affiant attests that he did not date the photo array, he merely signed it.

4.     Indeed, once Affiant agreed to state that Mr. Robinson was the individual who shot Mr. Hanford, Affiant was released with no charges.

5.     Less than one month later, in late March 2009, Affiant was brought to the grand jury to testify against Mr. Robinson. Affiant was again informed by the police officers that if he did not testify consistent with the statement he had signed, the drug charges could still be brought against him, and he would go to prison for a long time based on his background.

6.     At the time of Mr. Robinson's trial, Affiant was incarcerated in the Illinois Department of Corrections for aggravated DUI. When Affiant was brought to court, he informed the officers that he did not want to testify. Affiant was told that if he did not testify consistent

**EXHIBIT**

NO. _K_

**Robinson 002678**

with his prior statement and grand jury testimony, his current sentence could be extended or the drug charges that had not been brought previously could be brought back up. Affiant was not given an opportunity to speak with an attorney about these threats, and so he testified against Mr. Robinson.

7.     Contrary to Affiant's testimony at the trial of Mr. Robinson, as well as the purported statement by him given in early March 2009 and his grand jury testimony, Affiant states that he was not present for and did not witness the shooting of Christopher Hanford.

8.     Rather, it is Affiant's recollection that around the time of the shooting, in December 2008, he had taken a break from selling narcotics because of several run ins with the authorities. Thus, he was not on the street during the time of the shooting.

9.     Affiant did not see Lamarius Robinson with a handgun on December 3, 2008, nor did he see Mr. Robinson grab a gun from Lamarius and shoot Mr. Hanford. None of the events to which Affiant testified having seen were actually witnessed by Affiant. Affiant was given the information by the police officers who arrested him.

10.     Affiant has come forward now to set the record straight because he lied in his testimony and he wants to fix the mistake he made.

_Oscar Russell_
OSCAR RUSSELL     _Oscar Russell_
                                    June 16, 2014

Subscribed and sworn to
before this 16ᵗʰ day of
June, 2014

_Karin Joy Pannier_
Notary Public
My Commission Expires 11/14/17

OFFICIAL SEAL
KARIN JOY PANNIER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/14/17

2

**Robinson 002679**